Commonwealth *v.* Shupp, Appellant.

Argued May 22, 1950. Before DREW, C. J., STERN, STEARNE, JONES and BELL, JJ.

*D. M. Garrahan,* for appellant.

*Kenneth H. Koch,* District Attorney, for appellee.

OPINION BY MR. JUSTICE BELL, September 25, 1950:
Defendant was found guilty of murder in the first degree and the jury fixed the penalty at death. The evidence was clearly and amply sufficient to sustain the verdict; all controversial questions were left to the jury under proper instructions; and no objections were made to the charge of the trial judge, which was fair and adequate. The errors now complained of relate to the admission of statements or so-called confessions allegedly wrung from defendant in violation of his constitutional rights.

The defendant, Robert C. Shupp, 48 years of age, was an accountant and vacuum cleaner salesman. He had been keeping company with Marian Walck, the victim, for approximately a year. On Tuesday evening, September 6, 1949, at about 10:55 p. m., two Allentown police, Hamory and McHugh, discovered defendant slumped over the steering wheel of his Packard sedan in a drunken condition. On the floor in the back of the car they discovered the dead body of Marian Walck. There were three bullet wounds in her body from a .38 calibre revolver. Defendant, whose trousers were blood

stained, had in his pocket a .38 calibre revolver fully loaded and a box of shells from which an undetermined number had been removed. A ballistics expert testified that a bullet found on the floor of the car near the body and two taken from the body had been fired from the revolver found on defendant's person. *Defendant admitted* several times before trial and testified *at his trial* that a bullet from his gun killed Marian at about 6:30 or 7:30 p.m. on September 6th. He admitted several times prior to trial that he deliberately shot and killed his sweetheart because she cheated on him or dared him to shoot her, or that it was the result of a suicide pact; but he contended at the trial that the shooting was accidental or that he was so intoxicated that he could not have had a specific intent to kill. The question of intentional or accidental killing and the degree of intoxication and other questions as to which there was any controversy or conflict were left to the jury under proper instructions from the court; and the jury returned a verdict of guilty.

The sole question involved in this case according to appellant is whether a confession is properly admissible when "the accused was held by the police from September 6th to September 21st without a preliminary hearing; questioned intensively; was without assistance of counsel, relatives or friends, and was . . . denied the right to procure a lawyer."

Where an individual has been accused of breaking a state law, the courts of Pennsylvania as well as of the United States have been vigilant in enforcing and safeguarding such individual's constitutional rights. In determining these rights the Supreme Court of the United States has in recent years gone far beyond any prior federal or state decisions, especially where an accused has been unlawfully held incommunicado for long periods of time, or there are other facts in the particular case which tend to show that the funda-

mentals of a fair trial have been abridged. In the light of these decisions, which are, of course, binding upon us, we shall review the relevant facts and the pertinent authorities.

When Officer Hamory found Marian's body in the back of defendant's car, he took defendant to a nearby police car and questioned him. Defendant stated to Hamory that he had shot Miss Walck at about 7:30 p.m. that evening; that he had spent about $840.00 on her; that he "went with her for seven months and then she started to cheat on me, either Harry Beltz or Jim Henritzy. I shot her. It was Jim Henritzy". . . . "I pulled out the gun and she said I haven't got enough guts to shoot her and I shot her three times". Defendant also alluded several times to a suicide pact. "When I shot her it was a suicide pact. Said she wanted to make a suicide pact. I shot Marian, but I didn't shoot myself yet." Hamory continued to question Shupp in the car for about "a half an hour or—forty-five minutes", while other officers were completing their investigation of the area in which defendant and the deceased were found. Defendant was apparently then taken to police headquarters and questioned further in the presence of police officials by Officer Horner.

At about 1:00 a.m. on the morning of September 7th, defendant directed the police to the place of the shooting. Upon returning from this trip at about 2:00 a.m. defendant was taken to the morgue and identified the body of the deceased. While there the defendant stated in the presence of various police officials, the Coroner, and the Assistant District Attorney, that he shot her. The defendant was then taken to police headquarters where he was questioned in the presence of Detectives Horner and McCurley, Police Captain Kramer, the District Attorney, Assistant District Attorney and the Coroner. Defendant detailed his activities on the afternoon of September 6th; his drinking

at various places, how he went to the Lehighton Fair, had several more drinks and then picked up Miss Walck at about four-thirty where she worked in Lehighton. *Defendant repeated his story about accusing Miss Walck of cheating and again described how he secured the gun and after she taunted him with not having the nerve, he shot her three times while she lay on the rear seat of the car. He reloaded his gun to shoot himself but lost his nerve.* It is important to note that there was no objection at the trial to any of his testimony. Moreover, most of his statements were verified from defendant's own lips at the trial, and all facts in his statements to the officers were verified by defendant's own testimony with the exception of the shooting which he claimed at the trial was accidental.

Corporal Swann of the Pennsylvania State Police saw defendant at about 9:30 a.m., September 7, 1949. He testified, "I was introduced to the defendant and told [him] that I was starting the investigation, and he told me, 'I've told them already I met the girl, shot the girl. I showed them where, I showed them where I drove to, I showed them where I threw the gloves, the shells, and I don't have to say another God damn thing'."

At about 10:30 a.m. that same morning, after it was definitely ascertained that the crime had been committed outside the City of Allentown, Corporal Swann and Officer McCurley took the defendant to Whitehall Township police headquarters in Fullerton. These officers together with Officer Talotta of Whitehall Township again took defendant over the route to the scene of the crime. Defendant was given a cup of coffee on their return at about 11 o'clock a.m.

At the scene of the crime Corporal Swann asked defendant what happened and he answered, "Put down there I refuse to answer." Nevertheless the defendant

continued to answer questions or alternately to remain silent. They next went to the parking lot where the defendant was first found. Corporal Swann testified that at the parking lot "I asked him what happened then, after he parked the car. He says he wanted a lawyer. Q. 'I want a lawyer'? A. Wanted a lawyer. Q. All right, then what happened? A. Well, then we went back to the police station. Q. Then what did you do? A. Then Mr. Brennen came in and the defendant was photographed, fingerprinted by Sergeant Atkins. Q. Then what happened? A. I talked to the defendant after noon. Refused anything to eat."

The defendant was again taken to the scene of the crime accompanied by Swann, Talotta, Kramer, Atkins and the Assistant District Attorney. Mr. Brennen and Swann then took defendant to Squire Milson's office in Catasauqua where an information was lodged against defendant charging him with murder. Defendant was next taken by Brennen and Swann to the Lehigh County prison *where he was lawfully committed* on the afternoon of Wednesday, September 7, 1949.

Defendant was not questioned again until the afternoon of Saturday, September 10th, when Swann again talked to him in the presence of Officer Talotta and Warden Dressell. At about 4:30 p.m. defendant asked for Mr. Brennen, the Assistant District Attorney, who was called. Defendant was again questioned at about 10:00 p.m. that same night until about 3:30 a.m. of the following morning, Sunday, September 11th. Defendant again repeated his prior admissions about the crime. This was objected to because defendant had been allegedly deprived of counsel. *Defendant's son was present during this entire questioning in the Warden's office. Defendant had requested that his son be present,* which was apparently the reason the interrogation was conducted at such a late hour.

Prior to this interrogation, defendant asked to see the victim's body. Swann told him that was out of his jurisdiction but that the proper authorities would be consulted. This request was turned down by the judge who thereafter presided at the trial. Defendant *because of this refusal* refused to sign the statement which he gave to the police and which had been taken down stenographically.

Defendant testified he was induced to make his statements on September 11th (which were merely cumulative) because he was promised he could view his sweetheart's body and have two lawyers at the trial free. This was at variance with some of defendant's other statements and was denied by the Commonwealth's witnesses. The controverted testimony as to these alleged inducements were submitted to the jury under proper instructions from the court and the jury found against the defendant.

During the period of questioning on Saturday night, September 10th, and Sunday morning, September 11th, the defendant at his request was given about eight pills. The Warden testified that when defendant was admitted to the prison he complained about his nervousness, headaches and stomach trouble; that Dr. Good, the jail physician, prescribed phenobarbital pills about three times a day, the dosage to be two pills of a quarter grain each. He testified that the first six to eight pills given to defendant, when he first entered the prison, were phenobarbital and that thereafter—including September 10th and 11th—he was given only sugar pills. The defendant's son testified that he was told by the Warden and the Assistant District Attorney that the pills were phenobarbital, that at least eight pills were given and that his father was incoherent. The conflicts of testimony on this point were likewise submitted to the jury under proper instruc-

tions from the trial judge and were resolved by the jury in favor of the Commonwealth.

Swann again interrogated the defendant from about 12:30 p.m. to 6:00 p.m. on September 17, 1949. The defendant told him that he had an attorney and was not supposed to say anything. Swann said, "If you tell me to leave, I'll go", and defendant replied, "It's all right." and continued to talk to Swann. The record does not disclose that defendant made any material admissions in this lengthy interview.

*Were any of the aforesaid oral statements or admissions of defendant inadmissible because they were procured in violation of his constitutional rights?*

Defendant's first complaint is that he was held in prison for 15 days without a preliminary hearing. He was arrested by the police on the night of September 6th and turned over to the prison authorities on the afternoon of September 7th, charged with murder. On September 21st Shupp was given a preliminary hearing before Squire Milson in Catasauqua. The record shows that a date for the preliminary hearing was set at least ten days prior to said hearing on September 21st and defendant was so advised.

The defendant was lawfully in prison charged with an unbailable crime. *There is no prescribed time within which a preliminary hearing must be held*: *Commonwealth v. Agoston*, 364 Pa. 464, 72 A. 2d 575, certiorari denied U. S. Sup. Ct., Oct. 9, 1950; *Lyons v. Oklahoma,* 322 U.S. 596; and in any event, the delay, if it may be so characterized, in holding this hearing was, under the facts and circumstances in this case, immaterial.

The defendant's second complaint that he was held incommunicado from friends and relatives and denied counsel is not supported by the record. Within twelve hours after defendant's apprehension, defendant's son was present at the police station where he was being

held; and the son was also present during the entire period of the questioning of his father on September 10th from 10:00 p.m. until 3:30 a.m. next morning. There is no testimony whatsoever that defendant's son or relatives or friends were ever refused permission to see or communicate with defendant. Moreover less than 24 hours after his arrest, defendant was released by the police into the custody of the prison authorities where he was *lawfully held without bail*. He was not questioned again by the police until Saturday, September 10th-11th, a lapse of three days; then again on September 17th; and we repeat, there was no evidence to support defendant's present contention that he was unlawfully held incommunicado.

The defendant's third complaint is that he was denied counsel during the periods of his interrogation. This is not true. While the defendant in this case said, "I want a lawyer.", a reading of all the testimony demonstrates that he abandoned this request and continued to talk freely and to voluntarily answer any questions he felt like answering, and ignoring questions he did not wish to answer; *and counsel was never denied him.* Furthermore, when he was twice asked on September 11th whether he had counsel, he said that he had or would get his own attorney; and on September 17th he told Officer Swann that he had an attorney. The defendant on direct examination testified that he had told the District Attorney he wanted "to get in touch with Attorney Garrahan". On cross examination he admitted that he did not name to the District Attorney any particular attorney; that he had stated in response to the question whether he had a lawyer that he would have one for the preliminary hearing to be held on September 21st. The defendant further responded in cross examination as follows: "Q. Now, Shupp, do you remember my coming down to the Lehigh County prison and saying to you 'Do you

have a lawyer?'? A. Yes. Q. Now, what was your answer to that? A. I'd have a lawyer. Q. What's that? A. I'd have a lawyer. I'd have a lawyer for that certain hearing. Q. Did I ask you if you had a lawyer now? A. I said I'd have one." The defendant also indicated that he had ample funds for a lawyer and he would procure such lawyer for his preliminary hearing, which he did.

*There is no provision in the law of Pennsylvania,* or any decision of the United States Supreme Court or of our Court which requires *that a person arrested,* even though on a charge of murder, *must be provided with counsel as soon as he is taken into custody, or prior to indictment or arraignment: Commonwealth v. Agoston,* 364 Pa. 464, 72 A. 2d 575, certiorari denied U.S. Sup. Ct., Oct. 9, 1950; *Commonwealth v. Jones,* 341 Pa. 541, 19 A. 2d 389; *Lyons v. Oklahoma,* 322 U.S. 596.

" 'The mere fact that the defendant was under arrest, or was in the charge of armed police officers when he made his confession, will not make a confession involuntary': Commonwealth v. Spardute, 278 Pa. 37, 47 . . . Nor are the statements invalidated by reason of the fact that appellant was not represented by counsel, no request for such representation ever having been made . . . ." *Commonwealth v. Jones,* 341 Pa. 541, 548, 19 A. 2d 389.

"In Lyons v. Oklahoma, 322 U.S. 596, the defendant was indicted for murder. No counsel was supplied him until after his preliminary examination, which was subsequent to the confessions he had made. . . . The Supreme Court held . . . 'The mere questioning of a suspect while in the custody of police officers is not prohibited either as a matter of common law or due process. . . .' " . . . "(1) *The fact that the confessor is in custody and has no counsel does not invalidate*

*a confession made by him.* (2) The fact that the interrogation of a suspect continues until he confesses is not per se a ground for invalidating his confession, nor is the fact that the interrogation lasted for a considerable period of time any ground for invalidating the confession, unless the interrogation was so long in duraton as to amount to mental or physical coercion and duress.

"A long interrogation is not per se fundamentally unfair."* *Commonwealth v. Agoston,* 364 Pa. 464, 481, 483, 72 A. 2d 575, certiorari denied U.S. Sup. Ct., Oct. 9, 1950.

This defendant was not young or illiterate or ignorant of his rights or afraid of the law or the police or the prosecuting officers, several of whom he knew. This is obviously not a detention of a prisoner by police, without assistance of counsel, relatives, or friends by unlawfully holding him incommunicado; equally obviously, it is not a case of a confession made or obtained through fear or threats or promises or ignorance of rights or physical violence.

The sole remaining question—and it is a very important one—is raised by defendant's last complaint, viz: were defendant's statements or admissions or so-called confessions voluntary or, *because of the intense questioning,* were they obtained through mental coercion or duress?

For centuries it has been customary for police or other authorities whose duty it is to solve crime, or to apprehend, or try criminals, to question the accused in an attempt to solve the crime. This age-old practice if conducted fairly and in accordance with the Constitution and the law is not only proper, but is absolutely necessary for the protection of law-abiding citizens.

---

* Italics throughout, ours.

Defendant's first admissions right after his arrest on the night of September 6th were obviously uncoerced. He alleged that he was so drunk he did not realize what he was saying but the jury found against him on this point.

Considering not only the period of the interrogations, but also all the other factors involved, the defendant's admissions in our opinion were not coerced. *A very important and determining factor in this case is that the defendant never at or prior to the trial complained of this protracted examination or about his treatment by the police or by any official;* and his able and experienced counsel objected to these admissions only on the ground (a) defendant was (allegedly) denied counsel and (b) was held incommunicado.

Defendant was also examined three days later (September 10th-11th) for 5½ hours in the presence of his son. His admissions at this interrogation (which were again merely cumulative) were objected to at the trial, *not because they were coerced, or the result of a protracted mental ordeal,* but because he was allegedly given phenobarbital pills. This was denied and was obviously disbelieved by the jury.

We agree with the court below that defendant's constitutional rights were not infringed and that he had a fair trial.

Judgment affirmed.