Commonwealth *v.* Bolish, Appellant.

502

Argued March 14, 1955. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*John W. Bour*, with him *Raymond Bialkowski*, for appellant.

*Ralph P. Needle*, Assistant District Attorney, with him *Carlon M. O'Malley*, District Attorney, and *William J. Kearney*, Assistant District Attorney, for appellee.

OPINION BY MR. JUSTICE BELL, April 19, 1955:

Defendant was indicted for the murder of Robert J. Flynn. The jury convicted him of murder in the first degree and imposed the sentence of death. The Commonwealth contended that Flynn's death occurred as the result of arson and that his death was a felony

murder in the commission of which felony defendant was one of the principals. The Commonwealth's evidence consisted entirely of circumstantial evidence both with respect to the cause of Flynn's death and the defendant's connection with and responsibility therefor. From the Commonwealth's evidence the jury could reasonably and legitimately have found the following facts:

### Facts

An explosion followed by fire occurred in the early morning of July 22, 1953, in the house owned by Mrs. Mary Torti, the premises being numbered 115 Reeves Street in Dunmore Borough, Lackawanna County, Pennsylvania. Mrs. Torti's house was a two story house consisting of a kitchen and living room on the first floor and two bedrooms and a bathroom on the second floor. The house had been vacant for several months and at the time of the explosion there was no furniture in the house.

The explosion was heard, the flash was seen, and the fire was discovered immediately by neighbors. Firemen arrived about three minutes after the explosion. The interior was filled with intense heat, the woodwork and the walls were scorched and burned, and fire was playing around the screen of the front door. An electrical hot plate and an electric cord about 3 feet long were found on the kitchen floor. The electricity in the home was turned on. The fire originated on or near the hot plate. A pad was found near the hot plate which contained the odor of kerosene (the importance of which will hereinafter appear) and there was some broken glass nearby which appeared to be parts of a glass jar in which had been placed some volatile material. There was also an odor of gasoline in the kitchen. The fire was caused (according to the Commonwealth's experts) by an explosion of a volatile material placed

on the hot plate and the odor of kerosene remained up to the day of the trial, indicating that a good deal of kerosene was on the floor at the time of the fire. The time necessary to cause an explosion would be from 30 to 50 seconds after the electric current was applied to the hot plate or to the volatile material thereon. No hot plate was left in the house by Mary Torti when she cleaned and vacated it.

Flynn appeared about 4 o'clock on the morning of the fire (July 22nd) at the Ronda Coal Company office in Dunmore, badly burned. He sought water from the night watchman. He died 19 hours later as a result of burns. The Commonwealth established a trail of flesh, fragments of material and discarded shoes from the Torti house to within approximately 150 feet of the Ronda Coal Company office. Dr. Willard testified that in her opinion the hair from the venetian blind which was found in the Torti house on the window ledge came from the head of Flynn. The Commonwealth also proved that the discarded shoes belonged to Flynn. The evidence was sufficient to prove beyond a reasonable doubt that Flynn was in the Torti house when the fire and explosion took place in the early morning of July 22, 1953, and that he died as a result of the Torti fire.

There was no direct evidence to prove that defendant committed the arson, nor, as we have seen, was there any direct evidence that Flynn was present in the Torti house at the time of the explosion and fire. The defendant's connection with and responsibility for the arson can be thus summarized:

Mary Torti, the owner of the house, and her son-in-law, Michael Sika, furnished most of the money for the business of Louis Serrian and Stella Torti, daughter of Mary Torti. Their business owed debts of approximately $9,000. Serrian attempted to place fire in-

surance of $8,000. on Mary Torti's house. Defendant and Serrian were together in nearby Scranton about 2 hours before the fire. Several days before the fire and several times in the week preceding the fire, defendant and Serrian were seen conversing together.

Several weeks prior to the fire defendant, accompanied by two people, one of whom was a witness for the Commonwealth, stopped his car in back of the Torti house and pointed it out to the witness. The day before the fire, namely, July 21, defendant purchased from the Rafferty Gas Station a gallon of kerosene, which he took away in a jug that afternoon at 2:30. The bottom of the jug was covered with grease. At 8:30 the same evening defendant met Commonwealth's witness *Maddon and borrowed his car*. At the time of the fire defendant had not returned the car.

Robert Flynn, aged 17, had been frequently and very generously befriended by defendant. They met at 11 o'clock P.M. on July 21st, approximately 2 or 2½ hours before the fire; and around 12 midnight they left a restaurant together and drove off in defendant's (Maddon's) automobile. Immediately after the explosion and fire, neighbors saw a car being driven rapidly away from the Torti house. *The car was subsequently identified as Maddon's car*. At the time of the fire a man was seen on the porch of the Torti house, but could not be identified. After the fire, at about 2:45 A.M., Maddon met defendant in the vicinity of the Court House benches on Adams Avenue and gave him back the keys to his car which he had left on another street.

Defendant at this time said to Maddon, "By the way, Butchie [Flynn] borrowed one of your shirts"; and "Flynn's shirt is in your car."

The Commonwealth proved that the shirt which was burned and was found along the trail taken by Flynn

after the fire, was Maddon's shirt. Furthermore, after the fire a blanket was found in Maddon's car which Dr. Willard testified from chemical analysis contained kerosene and that this kerosene, in her opinion, came from the same original bulk container as the kerosene which Rafferty Garage sold the afternoon before to the defendant. Moreover, the witness further testified that the floor mat in the Maddon car contained a greasy ring which was the size of the gallon jar (with greasy bottom) which Rafferty Garage sold defendant the day before. Burnt pieces of paper were also found in the Maddon car.

Maddon testified that the day after the fire defendant said to him, "Don't tell them you loaned me the car. Tell them you loaned it to someone else. Tell them somebody stole it." Defendant twice denied to others that he had borrowed Maddon's car. Maddon also testified that when he met defendant at 3 o'clock in the afternoon of July 22nd he asked him about Flynn, to which defendant replied, "Yes, Butchie got himself into a little trouble." Maddon also testified that he told defendant he had found Butchie's (Flynn's) shirt and defendant then said: "Throw it away, get rid of it." Maddon then showed defendant a key which he found in Flynn's shirt and defendant said, "Give it to me" and took it. The key, which was a twin key for Mary Torti's house, was later found in the sewer at the American Auto Store corner where defendant had left Maddon.

Incidentally, defendant did not take the witness stand to deny any of the Commonwealth's evidence or explain or justify his statements or his conduct or his whereabouts at the time of the fire.

The jury could properly have believed (a) that defendant lied about Flynn, lied about Maddon's automobile, lied about his whereabouts the night before the

fire, and (b) that his statements and actions were those of a guilty man.

### Arson

The jury brought in a verdict of guilty of murder in the first degree. The Penal Code of March 31, 1860, and the Penal Code of June 24, 1939, P.L. 872, §701, 18 PS §4701, do not define "murder"; they merely divide murder into two degrees and prescribe what shall be murder in the first degree and what shall be murder in the second degree. Section 701 of the Penal Code of 1939 provides as follows: "All murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration of, or attempting to perpetrate any arson, rape, robbery, burglary, or kidnapping, shall be murder in the first degree. All other kinds of murder shall be murder in the second degree."

If defendant in the instant case was guilty of murder it was murder committed in the perpetration of or attempt to perpetrate arson.

Prior to the Criminal Penal Code of 1860 the authorities held that the arson, rape, robbery and burglary specified in the murder section of the Criminal Code meant *common law* arson, rape, robbery and burglary; and "At common law, arson consists of the wilful and malicious burning of the dwelling house of another: 3 Inst. 66; 1 Hale, P.C. 566; 1 Hawk. P.C. (8th Ed.) 137; 4 Bl. Comm. 220; 2 East, P.C. 1015.": *Commonwealth v. Bruno,* 316 Pa. 394, 400, 175 A. 518.

The Penal Code of 1939 §905 enlarged and to that extent changed the definition of arson,* and thus de-

---

* The Penal Code of 1939 also enlarged and changed the definition of rape and of burglary; and kidnapping, which was a misdemeanor at common law, was made a felony and was added to the Code's Section dealing with murder.

fined it: "Whoever, wilfully and maliciously, sets fire to or burns, or causes to be burned, or who aids, counsels, or procures the burning of any dwelling house, kitchen, shop, barn, stable, or other outhouse, that is parcel thereof, or belonging to or adjoining thereto, whether the property of himself or of another, is guilty of arson, a felony, and upon conviction thereof, shall be sentenced to imprisonment in solitary confinement for not exceeding twenty (20) years, or fined not exceeding ten thousand dollars ($10,000), or both. . . ."

Since the Penal Code of 1939, murder committed in the perpetration of any arson means arson as defined in §905 of the Penal Code of 1939: cf. *Commonwealth v. Maloney*, 365 Pa. 1, 73 A. 2d 707; *Commonwealth v. Carey*, 368 Pa. 157, 162, 82 A. 2d 240. In the *Maloney* case Chief Justice STERN said (page 11): ". . . When the Penal Code of 1939 refers to burglary in §701 [the murder section] it must be understood as meaning the crime of burglary as defined in §901 of the same Act", and not as common law burglary. In that case Maloney conspired with Niemi to rob a taproom. Niemi shot and killed the manager of the taproom while Maloney was running away. Although this was not a common law burglary, it was a burglary under the Act of 1939 and on this ground the verdict of murder in the first degree was sustained by the Court.

Circumstantial Evidence

There was, we repeat, no direct evidence of arson or identity or murder. Proof by eye witnesses or direct evidence of the corpus delicti or of identity or of the commission by the defendant of the crime charged is not necessary. ". . . It is clearly settled that a man may be convicted on circumstantial evidence alone, and a criminal intent may be inferred by the jury from facts and circumstances which are of such a nature as to prove defendant's guilt beyond a reasonable doubt:

Commonwealth v. Kloiber, 378 Pa. 412, 106 A. 2d 820; Commonwealth v. Homeyer, 373 Pa. 150, 94 A. 2d 743; Commonwealth v. Lowry, 374 Pa. 594, 600, 98 A. 2d 733; Commonwealth v. Danz, 211 Pa. 507, 60 A. 1070; Commonwealth v. Wentzel, 360 Pa. 137, 61 A. 2d 309": *Commonwealth ex rel. Garrison v. Burke,* 378 Pa. 344, 348, 106 A. 2d 587.

The jury, the trial Judge and the Court en banc were convinced that the Commonwealth proved beyond a reasonable doubt that the defendant was guilty of arson. Judge ROBINSON, who dissented on the ground of felony murder, said: "I agree with the majority that the evidence established the guilt of Bolish [defendant] for the crime of arson beyond a reasonable doubt."

### Murder

We now come to the main contention of the defendant, viz.: the killing which resulted from this arson could not amount to a so-called felony murder and consequently was not murder under the law of Pennsylvania. Expressed another way, the so-called felony murder doctrine does not apply to the death of an accomplice which resulted from the accomplice's own act in the perpetration of arson. That raises a very important question which has never been specifically decided by this Court, although there are a number of closely analogous cases. Defendant assumes (a) that Flynn was an accomplice and (b) actually set the fire which caused his own death, and based on this premise argues that Flynn's act was an intervening and superseding force which relieved defendant from the killing.

Murder has never been defined by Statute in Pennsylvania; it has often been said that it is "common law murder". Cf. *Commonwealth v. Exler,* 243 Pa. 155, 89 A. 968; *Commonwealth v. Kelly,* 333 Pa. 280, 4 A. 2d 805; *Commonwealth v. Dorazio,* 365 Pa. 291, 74 A. 2d 125. It would probably be accurate to say that our idea,

510

our theory and our definition of murder was derived from and was based initially entirely, and today—because of statutory changes dealing with first degree murder by the perpetration of arson, rape, burglary and kidnapping—almost entirely upon the common law.

The theory of the common law was that anyone who committed a common law felony * possessed legal malice; and where a killing naturally resulted therein or therefrom, even though the killing was unintentional or accidental, the legal malice was carried over from the original felony and the original felon was guilty of murder.

Murder in Pennsylvania was first authoritatively defined in the famous case of *Commonwealth v. Drum*,** 58 Pa. 9, 15. "Murder", Mr. Justice STEARNE aptly said, in *Commonwealth v. Buzard,* 365 Pa. 511, 515, 516, 76 A. 2d 394, "is defined as an unlawful killing of another with malice aforethought, express or implied." The legislature divided murder into two classifications, murder in the first degree and murder in the second degree; and provided that (1) all murder perpetrated by poison or lying in wait, or by any other kind of wilful, deliberate or premeditated killing, or any murder which shall be committed in the perpetration of or attempt to perpetrate certain specified felonies, is murder in the first degree and (2) every other kind of murder is murder in the second degree: Act of 1939, June 24, supra.

Malice express or implied is the criterion and absolutely essential ingredient of murder. Malice in its

---

* At common law there were 8 or 9 felonies, namely, murder, manslaughter, rape, sodomy, robbery, larceny, arson, burglary, and perhaps mayhem: Clark & Marshall, Crimes §3 (4th ed. 1940) : 1 Wharton, Criminal Law §26 (12th ed. 1932).

** *Commonwealth v. Drum* is still the basis for much of the homicide law of Pennsylvania today.

legal sense exists not only where there is a particular ill will, but also whenever there is a wickedness of disposition, hardness of heart, wanton conduct, cruelty, recklessness of consequences and a mind regardless of social duty. Legal malice may be inferred and found from the attending circumstances.

To summarize: If there was an unlawful killing with (legal) malice, express or implied, that will constitute murder even though there was no intent to injure or kill the particular person who was killed and even though his death was unintentional or accidental: cf. *Commonwealth v. Almeida*, 362 Pa. 596, 68 A. 2d 595; *Commonwealth v. Moyer* and *Commonwealth v. Byron*, 357 Pa. 181, 53 A. 2d 736; *Commonwealth v. Guida*, 341 Pa. 305, 19 A. 2d 98; *Commonwealth v. McLaughlin*, 293 Pa. 218, 142 A. 213; *Commonwealth v. Robb*, 284 Pa. 99, 130 A. 302; *Commonwealth v. Lowry*, 374 Pa. 594, 98 A. 2d 733; *Commonwealth v. Buzard*, 365 Pa. 511, 76 A. 2d 394; *Commonwealth v. Dorazio*, 365 Pa. 291, 74 A. 2d 125; *Commonwealth v. Sterling*, 314 Pa. 76, 170 A. 258; *Commonwealth v. Lessner*, 274 Pa. 108, 118 A. 24; *Commonwealth v. Exler*, 243 Pa. 155, 89 A. 968; *Commonwealth v. Drum*, 58 Pa. 9; 4 Blackstone, Commentaries 192-193; 40 C.J.S. §13 p. 857, §20 p. 866, §21 p. 868; Wharton, Homicide §2 p. 2, §92 p. 112 (3rd ed. 1907); Maurer, Pennsylvania Criminal Law: Murder §3582 p. 915 et seq., §3689 p. 953 et seq.; 1 Warren, Homicide §74 (Perm. ed. 1938); Clark & Marshall, Crimes §245 (4th ed. 1940).

In *Commonwealth v. Guida*, 341 Pa., supra, the Court said (page 308): ". . . We have held again and again that *an unintentional homicide in the commission or attempted commission of a felony such as rape, burglary, or robbery was murder at common law: * "

---

* Italics throughout, ours.

In *Commonwealth v. Lowry*, 374 Pa., supra, we held that when a killing occurs in a robbery, a lookout or driver of the getaway car was just as guilty of murder in the first degree as the man who fired the fatal shot. The Court said (pages 600-601): "In Com. v. Robb, 284 Pa. 99, 130 A. 302, the defendant was indicted and convicted of murder. He was a lookout and had nothing to do with the burglary or the murder. The Court said: 'If defendants "combine to commit a felony or make an assault, and, in carrying out the common purpose, another is killed, the one who enters into the combination but does not personally commit the wrongful act is equally responsible for the homicide with the one who directly causes it": Com. v. Micuso, 273 Pa. 474, 478. "It is not necessary, however, to prove that the party actually aided in the commission of the offense; if he watched for his companions, in order to prevent surprise, or remained at a convenient distance in order to favor their escape, if necessary, or was in such a situation as to be able readily to come to their assistance, the knowledge of which was calculated to give additional confidence to his companions, in contemplation of law he was aiding and abetting": Weston v. Com., 111 Pa. 251, 263; Com. v. Biddle, [200 Pa. 640].' "

In *Commonwealth v. Moyer and Byron*, 357 Pa. 181, 53 A. 2d 736, defendants attempted to hold up a gas station operated by Earl Shank. Shank and the defendants exchanged shots; one of Shank's shots accidentally struck and killed a gasoline attendant. Defendant's conviction of murder in the first degree with sentence of death was sustained by this Court. The Court in its opinion said (pages 190-191) : ". . . Blackstone, Book IV, section 199, says that 'The grand criterion which now distinguishes murder from other killing' is that malice which is 'the dictate of a wicked

depraved and malignant heart.' This court said in Commonwealth v. Kelly, 333 Pa. 280, 287, 4 A. 2d 805, 'To this Commonwealth one must answer as a malicious criminal for any fatal injury he here causes a human being by anything done by him intentionally or unintentionally during the commission or attempted commission of any of the specified felonies, for malice is the mainspring of his outlawed enterprise and his every act within the latter's ambit is imputable to that base quality. *Such a rule is essential to the protection of human life.*' In that case we held, as we had previously in Commonwealth v. Lessner, 274 Pa. 108, 118 A. 24, that 'when in the commission or attempted commission of a robbery there is "no break in the chain of events" between the felony and the shooting which caused death, even though "the discharge [of the gun] was unintentionally caused [by the felon] while struggling with his victim, or with a third party, who came to the latter's assistance," *the defense of accidental killing is inadmissible* and the homicide is, under the statute, "murder of the first degree." '

"The doctrine that when malice is the mainspring of a criminal act the actor will be held responsible for any consequence of his act though it was not the one intended was recognized centuries ago when it was held that, quoting from Blackstone, Book IV, page 1599, section 201, 'if one shoots at A and misses him, but kills B, this is murder, because of the previous felonious intent, *which the law transfers from one to the other.*' (Italics supplied)"

How far Pennsylvania has gone in holding that each of the persons who participated in a criminal act such as robbery is guilty for all the acts of his confederates in furtherance of the common design, is strikingly apparent from *Commonwealth v. Doris*, 287 Pa. 547, 135 A. 313. In that case one of the robbers killed

a policeman during his escape or flight and this killing occurred after the defendant, who was a co-robber, had been seized by and was in the custody of police officers; yet this Court sustained defendant's conviction of murder in the first degree with penalty of death.

In Clark and Marshall on Crimes (4th Ed.) page 298, the law is thus stated: "§245. Homicide in the Commission of a Felony. (a) In General.—At common law, malice was implied as a matter of law in every case of homicide while engaged in the commission of some other felony, and such a killing was murder whether death was intended or not. The mere fact that the party was engaged in the commission of a felony was regarded as sufficient to apply the element of malice.

"On this principle, it was murder at common law unintentionally to kill another in committing, or attempting to commit, burglary, arson, rape, robbery, or larceny.

"The doctrine has repeatedly been recognized and applied in this country, and is to be regarded as still in force, except where it has been expressly abrogated by statute."

In Wharton on Homicide, (3rd Ed.) page 175, the law is thus stated: "These rules apply to maliciously setting fire to a building causing the death of a person therein, though unintended, such killing being murder in the first degree. And a homicide perpetrated in the attempt to commit a rape is murder in the first degree, whether the killing was by accident or design; and so with a killing occurring in the perpetration of a robbery."

*Commonwealth v. Almeida*, 362 Pa., supra, is on its facts so analogous to the instant case and in principle so directly controlling that we shall quote from that exhaustive opinion at some length. That case decided

that where an officer was killed in attempting—after a robbery—to prevent the escape of the robbers, all the robbers were guilty of murder in the first degree even though the fatal shot was fired by a policeman or by an innocent bystander. The defendant in that case contended that he could not be convicted of murder unless he fired the fatal shot. The Court rejected this contention and sustained the following charge to the jury:

". . . it makes no difference who fired the shot, even if a shot was fired by Mrs. Ingling [a passerby who was the wife of the man who was shot and killed] it was murder. . . . If that [fatal] shot were fired by anyone, even anyone removed from these three participants, and that shot was fired in the perpetration of a robbery, . . . that is murder; that is murder in the first degree."

This Court in its opinion said, inter alia: "The legal question presented and decided in the [Commonwealth v.] Moyer-Byron case was precisely the legal question raised in the instant case; to wit, when men who are feloniously shot at by robbers return their fire in self-defense and a third person is killed by a shot fired by the defenders, are the robbers whose felonious action caused the shooting guilty of murder? In the Moyer-Byron case this Court after a thorough discussion of that question decided that under the facts of that case, 'The Moyer-Byron felonious invasion of the Shank gas station on July 13, 1946, was likewise the proximate cause of the resultant fatality.' (191 of 357 Pa.) . . . Our decision in the Moyer-Byron case was an application of the long established principle that he whose felonious act is the proximate cause of another's death is criminally responsible for that death . . . 'Though there is an active force intervening after defendant's act, the result will nevertheless be proximate

*if the defendant's act actively cause the intervening force. . . .*

"Justice HOLMES in his book on 'The Common Law,' (36th Ed.) pp. 56 and 57, said: *Acts should be judged by their tendency under the known circumstances,* not by the actual intent which accompanies them. . . . *'the object of the law is to prevent human life being endangered or taken. . . . the law requires [men] at their peril to know the teachings of common experience,* just as it requires them to know the law. . . . *the test of murder is the degree of danger to life attending the act under the known circumstances of the case.'*

". . . The felonious acts of the robbers in firing shots at the policemen, well knowing that their fire would be returned, as it should have been, was the proximate cause of Officer Ingling's death.

"The doctrine of proximate cause in criminal cases was applied by the Supreme Court of Tennessee in Letner v. State, 299 S.W. 1049 (1927). The facts were that three youths were crossing a river in a boat at a dangerous point. When the boat was about in the middle of the river someone standing above the western bank shot into the water about six feet from the boat. A second shot hit the water nearer the boat whereupon one of the youths jumped out causing the boat to capsize as a result of which the two other occupants were drowned. The man who fired the shot was indicted for murder. The defense contended that the death of the two youths was caused by the capsizing of the boat by the third occupant and that this act constituted a supervening cause. The Court held that the defendant could not avoid the consequences of his wrongful act by relying on a supervening cause which resulted naturally and proximately from that act. The Court said: '. . . in the instant case the wrongful act of the defendant; that is, firing at or near the boys in the

boat, was the proximate cause, *the producing cause,* the cause that was primarily responsible for the death of deceased.'. . .

"In State v. Leopold, 110 Conn. 55, 147 A. 118, 121,* the defendant and another were tried for murder of two boys, children of a tenant, by willfully burning a building. Defendant employed one Weiss to set fire to the building for the purpose of collecting the insurance. . . .

"The two boys of the tenant perished in the fire. It appeared that the boys either remained in the building, or when on the way out were sent back by their father to recover some property and became trapped. The defendant requested the court to charge that 'if they [the boys] had a reasonable opportunity to escape from the burning building and would have escaped but for their own conduct or the act of their father in directing them to return, the accused could not be found guilty of causing their death.' This instruction the court refused and told the jury that 'the negligence of the victims of a crime did not diminish or nullify the crime and that even if they found the claim as to the conduct of these boys to be true the accused would not thereby be excused.'

"The Supreme Court of Connecticut said: 'Every person is held to be responsible for the natural consequences of his acts, and if he commits a felonious act and death follows, it does not alter its nature or diminish its criminality to prove that *other causes cooperated to produce that result.* . . . If the death of these boys resulted in a *natural sequence* from the setting of the building on fire, even though their conduct contributed to or was the immediate cause of it, *the accused would be responsible;* and the effort of a person

---

* This case is particularly pertinent to the case at bar.

to save property of value which is liable to destruction by fire is such a natural and ordinary course of conduct that it cannot be said to break the sequence of cause and effect.' The conviction of the defendant was sustained.

. . .

". . .'Defendant's act or omission need not be the immediate cause of the death; he is responsible if the direct cause results naturally from his conduct.'

. . .

"Under neither the common law nor our statute is an accidental killing murder. It is not even a felony. *Yet this Court has uniformly held that an accidental killing in the perpetration of or the attempt to perpetrate a robbery or burglary or any other of the enumerated felonies is murder in the first degree.* The reason is that any person committing or attempting to commit, any of these major felonies is *motivated by malice* and when the killing of a human being directly results, even though *not intended,* from his malicious act, it is murder because *malice,* the essential element of murder, *is present. The Felon's malicious act* in perpetrating or attempting to perpetrate, his planned major crime is justly regarded by the law as the *causative antecedent of the homicide.* In cases of this kind society puts its punitive hand on the person responsible for the legally blamable cause. This doctrine is authoritatively recognized in the law.

. . .

"What Justice CARDOZO said is applicable here: 'when they [judges] are called upon to say how far existing rules are to be extended or restricted, *they must let the welfare of society fix the path, its direction and its distance. . . .*

. . .

*"A knave who feloniously and maliciously starts 'a chain reaction' of acts dangerous to human life must be held responsible for the natural fatal results of such acts.* This is the doctrine enunciated by the textbook writers on criminal law, and which has been applied by the courts."

Courts have a duty, especially in these days when crime has become so prevalent, to see that the lives, the property and the rights of law-abiding people are protected and consequently must delicately balance the scales of justice so that the rights of the public are protected equally with those of persons accused of crime. An arsonist is bound to know the perils and natural results of a fire which are reasonably foreseeable according to the common experience of mankind, and in particular to know that an occupant of the building set on fire, an accomplice, a fireman and the public who are likely to come to watch the fire, may die in or as a natural proximate result of the fire. The attempt of an officer or person to put out the fire, or to rescue people or property therein, or the attempt of any person to escape from the burning building does not constitute in legal contemplation a superseding cause which is sufficient to relieve the arsonist from murder in the first degree. In reason, logic and principle we can see no valid distinction between those cases and a case where an accomplice is killed while setting fire to a house (or building) or attempting to escape therefrom,—the latter's death is just as readily foreseeable as is the death of an owner who attempts to escape or to rescue lives or property from the building. In the interest and for the protection of society a knave who procures another to perpetrate an unlawful act which is dangerous to human life must be held legally responsible for any death which is a natural result of such act.

We may thus summarize what has become the settled law of Pennsylvania: If a person with legal malice commits an act or sets off a chain of events from which, in the common experience of mankind, the death of another is a natural or reasonably foreseeable result, that person is guilty of murder, if death results from that act or from the events which it naturally produced. If the original malicious act was arson, rape, robbery, burglary or kidnapping, the original actor is guilty of murder in the first degree. The original actor will not be guilty of murder if an intervening *and superseding* act occurs which is both actually and legally sufficient to break the chain of events. Whether the intervening act is legally sufficient to break the chain and thereby relieve the original actor is a matter of law for the Court: *Commonwealth v. Almeida,* 362 Pa., supra; *Commonwealth v. Williams,* 304 Pa. 299, 156 A. 86; *Commonwealth v. Lessner,* 274 Pa. 108, 118 A. 24; *Commonwealth v. Moyer & Byron,* 357 Pa. 181, 53 A. 2d 736. If the Court is of the opinion that it is legally sufficient, then whether it actually occurred and whether it actually broke the chain of events sufficiently to relieve the original actor is a matter of fact for the jury. Cf. *Commonwealth v. Kelly,* 333 Pa. 280, 4 A. 2d 805.

In the light of the foregoing principles we turn to defendant's next contention, which is, that "The Trial Judge erred in not instructing the jury that they had to acquit if they found that Flynn was the substantial or proximate cause of his own death." Even if it be assumed that Flynn was an accomplice, there was, as we have seen, no evidence in this case which was legally sufficient to make any act of Flynn a superseding cause and thus relieve defendant from the natural consequences of his malicious, felonious arson. To charge on the complicated subject of proximate or in-

tervening or superseding cause, when the Court determines there has been no superseding cause, is unnecessary: *Commonwealth v. Almeida,* and other cases hereinabove set forth; compare also *Commonwealth v. LaRue,* 381 Pa. 113, 112 A. 2d 362 and *Commonwealth v. Meleskie,* 278 Pa. 383, 123 A. 310; and for the reasons set forth at length in *Commonwealth v. Comber,* 374 Pa. 570, 578-9, 97 A. 2d 343, it is unwise, since it would merely tend to confuse the jury with the result that society would not be adequately protected and many dangerous criminals would never be convicted of their crimes.

The defendant further complains that the trial Judge charged the jury that if Flynn was the substantial cause of his own death his act of killing himself superseded Bolish's acts and broke the chain of events and even though Bolish was a felon *they would have the right* to find Bolish not guilty of murder. This charge was far more favorable to defendant than he was entitled to. It would have been wise for the Court to charge the jury, in the words of *Commonwealth v. Almeida,* 362 Pa., supra, that if they were convinced beyond a reasonable doubt that defendant set fire to the Torti house or procured Flynn to do so, and Flynn died as a result of burns received in that fire, either while watching the house or setting fire to the house, or attempting to escape from the house, that would be murder in the first degree.

It is clear that the verdict of the jury, to wit, murder in the first degree, was proper and justifiable under the evidence and the law, unless there were trial errors which necessitate a new trial.

### Trial Errors

The question of trial errors has given us grave concern.

The district attorney told the jury that certain evidence was "uncontradicted and undenied" in this case. Defendant contends that was prejudicial error because it could have been denied or contradicted only by the defendant himself, and under the Act of May 23, 1887 he does not have to take the witness stand and his failure to do so may not be treated as creating any presumption against him, nor be adversely commented on by Court or counsel during the trial. We have recently decided this very question, adversely to the defendant, in *Commonwealth v. Kloiber*, 378 Pa. 412, 106 A. 2d 820. We there reiterated—citing many cases in support—that the Court and the district attorney could properly say that the evidence of the Commonwealth was uncontradicted and undenied, but neither the Court nor the district attorney could adversely refer to defendant's failure to take the witness stand or draw an unfavorable inference from his failure to testify. We find no merit in this contention of defendant.

Defendant contends that it was error to admit in evidence a tape recording of a statement of Mrs. Serrian made in the presence of the defendant, the important parts of which he denied; and that it was also error to admit those parts of a tape recording interrogation of the defendant by the district attorney, who several times accused defendant of lying and likewise stated his belief in defendant's connection with the Torti arson.

Statements made in the presence of a defendant cannot be used as evidence against him unless he acquiesced in them affirmatively or by his silence when he should have spoken. If defendant admits any part of the statement, or acquiesces in a part of the statement affirmatively or by his silence when he should have spoken, that part of the statement is admissible

as a confession or admission against interest: *Commonwealth v. Mazarella,* 279 Pa. 465, 124 A. 163; *Commonwealth v. Johnson,* 213 Pa. 607, 63 A. 134; *Commonwealth v. Epps,* 298 Pa. 377, 148 A. 523; *Commonwealth v. Oreszak,* 328 Pa. 65, 195 A. 45. Furthermore, as to statements or parts of statements which are inadmissible in evidence, defendant cannot be cross examined with reference thereto: *Commonwealth v. Mazarella,* 279 Pa., supra. The rule on this point is aptly stated by Mr. Justice, now Chief Justice STERN in *Commonwealth v. Vallone,* 347 Pa. 419, 32 A. 2d 889 (pages 421, 422): "The rule of evidence is well established that, when a statement made in the presence and hearing of a person is incriminating in character and naturally calls for a denial but is not challenged or contradicted by the accused although he has opportunity and liberty to speak, the statement and the fact of his failure to deny it are admissible in evidence as an implied admission of the truth of the charges thus made. The justification of this rule is to be sought in the age-long experience of mankind that ordinarily an innocent person will spontaneously repel false accusations against him, and that a failure to do so is therefore some indication of guilt. Of course, it is far from conclusive; it is analogous to the rule which permits evidence of the flight of the accused, his demeanor and conduct when charged with crime or taken into custody, and other acts and circumstances indicating his reaction to the situation in which he is involved. . . . The cases are abundant in which such evidence was received where the incriminating statement had been made in the presence of the accused *after* his arrest and while in custody: [cases cited]." See also: *Commonwealth v. Shupp,* 365 Pa. 439, 75 A. 2d 587; *Lyons v. Oklahoma,* 322 U. S. 596.

However, false or contradictory statements by the accused are admissible since the jury may infer therefrom that they were made with an intent to divert suspicion or to mislead the police or other authorities, or to establish an alibi or innocence, and hence are indicatory of guilt: *Commonwealth v. Lowry*, 374 Pa. 594, 601, 98 A. 2d 733, and cases cited.

The trial Judge admitted the aforesaid tape recording statements (a) of Mrs. Serrian and (b) interrogations of the defendant by the district attorney not for the purpose of showing admissions of guilt, "but for the sole purpose of showing that the defendant in the course of an official inquiry made evasive and contradictory statements tending to deceive the investigators, thus constituting one fact in a chain of facts indicating guilt."

In *Commonwealth v. Clark*, 123 Pa. Superior Ct. 277, 187 A. 237, President Judge KELLER wisely said, page 285: ". . . The phonograph, the dictaphone, the talking motion picture machine and similar recording devices, with reproducing apparatus, are now in such common use that the verity of their recording and reproducing sounds, including those made by the human voice in conversation, is well established; and as advances in such matters of scientific research and discovery are made and generally adopted, the courts will be permitted to make use of them by way of presenting evidentiary facts to the jury."

We therefore hold that tape recordings are admissible in evidence when they are properly identified and are a true and correct reproduction of the statements made, and when the voices are properly identified.

In the light of these principles, we turn now to Mrs. Serrian's tape recorded statements.

Mrs. Serrian was asked in the presence of defendant about a conversation she had with her husband in

which he said that "I know a guy that [burns down a place]"; and that he later said the guy's name was Danny. Danny Bolish, when asked about Mrs. Serrian's hearsay talk with her husband, denied he ever set fire to any place anywhere. That was obviously hearsay evidence which was denied and was therefore inadmissible. We have also considered all the statements made in this interrogation of Mrs. Serrian. Bolish denied all important accusations. Some of his answers appeared to be evasive, but the statements and answers as a whole tended not to prove guilt or recent fabrications or false or contradictory statements, but merely to create a prejudicial atmosphere against defendant; consequently their admission constituted reversible error.

Defendant also objects to the admission of the tape recording interrogation of the defendant in which the district attorney several times accused defendant of lying; and in other parts of the interrogation expressed his belief that defendant was connected with the fire. The statements made by the district attorney were often in the form of accusatory questions, most of which defendant denied, or said he had nothing to say, or would answer in court. For example, the district attorney said to defendant that if he was an innocent man he would tell the authorities he had nothing to do with it; in another part, after defendant said he would answer in court and didn't want to talk at that time, the district attorney said, "Is it because you're afraid and you're guilty?" The district attorney also several times said to defendant (in these question and answer statements) that he *proved* to defendant many things, enumerating them, which showed defendant was guilty of the Torti arson.

We have reread several times the district attorney's interrogations of the defendant and considering them

in their entirety we are convinced that the district attorney, in his overzeal, unintentionally went too far, and that the admission of these interrogatories or statements deprived defendant of a fair trial and amounted to a denial of Due Process: *Viereck v. U. S.*, 318 U. S. 236. In *Viereck v. U. S.*, supra, the Court said (pages 247, 248): ". . . we direct attention to conduct of the prosecuting attorney which we think prejudiced petitioner's right to a fair trial, . . . . In his closing remarks to the jury he indulged in an appeal wholly irrelevant to any facts or issues in the case, the purpose and effect of which could only have been to arouse passion and prejudice. . . . 'It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.' Berger v. United States, 295 U. S. 78, 88." For this additional reason, a new trial must be granted.

It is unnecessary to discuss any of the other contentions made by defendant.

Since the trial errors were in all probability sufficient to prejudice the jury against the defendant: Cf. *Berger v. United States*, 295 U. S. 78, 89; we have no recourse other than to grant a new trial in this case.

Sentence and judgment of the Court below is reversed, and a new trial is awarded.

CONCURRING OPINION BY MR. JUSTICE JONES:

Under this court's ruling in *Commonwealth v. Almeida*, 362 Pa. 596, 68 A. 2d 595, an accidental killing, which can be factually found to have been a foreseeable result of the events set in train by a perpetration or attempt to perpetrate a felony, constitutes the felon guilty of murder under the felony-murder doc-

trine regardless of whose act directly caused the fatality. The distinction between the instant case and the *Almeida* case is that the victim here was either a confederate or a dupe of the surviving alleged felon and not an innocent third person. The defendant is therefore triable for murder either because the death occurred as a result of an act of his confederate while furthering the felony, or from the defendant's having ordered his dupe to perform an act of inherently great danger.

I agree that the admission at trial of certain objectionable portions of a tape recording was harmful and prejudicial error which necessarily requires a retrial of the case.

---

OPINION BY MR. JUSTICE MUSMANNO, CONCURRING AND DISSENTING IN PART:

On July 22, 1953, Robert J. Flynn, 18 years of age, died as the result of serious burns accidentally received in a flash fire in an empty house (belonging to one Torti) in Dunmore, Lackawanna County, which fire he had himself ignited in pursuance of an arsonious plan probably entered into with the defendant, Daniel Bolish. Bolish was indicted for murder, and the jury returned a verdict of first degree murder with the death penalty. The evidence fairly well established circumstantially that Bolish was involved in the arson plot, which was to destroy for insurance purposes the house in which Flynn was fatally burned, but it failed completely to place Bolish at the scene of the fire.

The Commonwealth tried its case against Bolish on the theory that he was the instigator of the arson plan and that, therefore, he was guilty of what has been called felony-murder, under Section 701 of the Penal Code of 1939 which provides: "All murder which

shall be perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration of, or attempting to perpetrate any arson, rape, robbery, burglary or kidnapping, shall be murder in the first degree. All other kinds of murder shall be murder in the second degree."

I do not believe that the framers of this criminal statute (enacted originally March 31, 1860) ever intended it to cover a situation such as the one involved here. At common law every felony was a capital offense. It, therefore, followed that any death which occurred in the perpetration or attempted perpetration of a felony was itself a felony and the perpetrator was punished because it was immaterial whether he was hanged for one felony or another. When some of the harshnesses and inhumanities of the criminal law were modified, the penalty of death was limited to treason and the more brutal crimes of violence; and the crime of murder itself was defined with some precision. Succinctly stated murder became the unlawful killing of another with malice aforethought. If unintentional death resulted during the perpetration of a felony the malice of the initial act carried over to the act of killing and it thus also became murder. The purpose of our statute of 1860 was to restrict this socalled felony-murder to the five most heinous offenses, namely, arson, rape, robbery, burglary and kidnapping. The felony-murder thus became an integral and inseparable part of the antecedent individual offense. There is nothing in the history of the criminal law and the foundation of reason supporting it which justifies the rationalization that any fortuitous killing becomes murder simply because of proximity in time or place to the perpetration or attempted perpetration of a named felony. The killing has to be tainted with some

elements of common law murder before the actor can be punished as a murderer.

It is to be noted that the Statute of 1860 says nothing about accidental death or even death generically. Using the words applicable to this case, we would read: "All murder which shall be committed in the perpetration of or attempting to perpetrate arson shall be murder in the first degree." The subject of this statutory provision is *murder,* not killing. Thus, before there can be a felony-murder, there must be a murder. The death of Flynn was not *per se* murder. It had none of the ingredients of murder. It was not an unlawful killing inflicted by some one else and it was not done with malice. In order to hold Bolish guilty of murder under the circumstances of the Flynn death, the statute would need to have a different wording, namely, "All *deaths* which shall result in the perpetration of or attempting to perpetrate arson shall be murder in the first degree."

It seems to me that this subject of felony-murder has been somewhat loosely treated in recent years. In the first place, the term itself is awkward and obscure. Why felony-murder? What does it mean? What does it comport? Every murder is a felony, but not every felony is a murder. I believe that in expressing the situation intended by the statute, the better term is the English one of *constructive murder.* A constructive crime is one which occurs when an original unlawful act develops, through no intention of the actor, into a second unlawful act, and the actor is charged with the second act. Before one can be charged with a constructive crime, however, it must be shown that the second act was one committed in furtherance of the original criminal plan. In order to have constructive murder, there must be an unbroken continuity of circumstances between the attempted or completed felony and the

death. Thus, if during a robbery there is an exchange of shots between the robbers and the police, and a policeman is killed, even by a bullet coming from a revolver in the hands of a fellow-policeman, all the robbers are guilty of constructive murder because the death occurred while the actors were engaged in the furtherance of the original criminal plan. This holds true even if the killing occurs while the robbers are escaping because of course this act is also part of the criminal plan, for, without the escape the contemplated criminal enrichment could not be achieved.

But in the case at hand the death of Flynn was not something within the scope of the arson plan. Instead of its being in furtherance of the criminal design, it was actually in hindrance of it. The death of an accomplice removes an executant of the enterprise and this fact might well cause a collapse of the entire criminal venture.

All forces of law and order are naturally interested in the punishment of criminals, but there is no more legal justification for electrocuting an arsonist when the law does not provide such a penalty than there was moral warrant for hanging pickpockets during the early days of the common law. Whatever Daniel Bolish did, it was not constructive murder and, regardless of the extent of his knavery, he should not suffer death for an act which does not fall within the provisions of the code for murder. The most energetic proponent of the felony-murder doctrine would scarcely argue that if Flynn had died of a heart attack while he was in the Torti home, Bolish would be guilty of murder. Nor could it be maintained that if Flynn had shot a bullet into his own head after igniting the fire in the Torti home, Bolish should be held for felonious homicide. But such hypothetical deaths are no more removed from Bolish's intentions than was Flynn's actual death, which was admittedly accidental.

There is no authority in Pennsylvania law which declares that a co-conspirator can be charged with murder for the accidental death of an accomplice during the perpetration or attempted perpetration of arson. The Trial Judge recognized this lack of authority and accordingly charged the jury: "The law of Pennsylvania, as I have told you, says that murder is the killing of another and one is not chargeable with murder for killing one's self. That is, if he was the substantial cause of his own death, that as the substantial cause it superseded the other chain as the proximate cause of death, then in that event, even though you consider Bolish was a felon, you would have the right to find Bolish not guilty of the crime charged against him in this indictment."

The Trial Judge said further: "If you do not find that the Commonwealth has proved to you beyond a reasonable doubt that this defendant, Bolish's, action was the proximate cause of the harm and subsequent death of Flynn; that Flynn's own willing, understanding action superseded, in the chain of events as the substantial cause of the harm to him, the original chain set in motion by Bolish, then you would have to acquit him." This part of the charge was eminently correct. Naturally if the chain of events set in motion by Bolish was broken by an independent act of Flynn's, Bolish could not be held responsible for what followed.

However, the lower Court seeks to sustain the verdict of first degree murder on a theory which has absolutely no substantiation in the record, namely, that Flynn was innocently within the Torti house. The circumstantial evidence establishes that Flynn entered the Torti house by means of a key to which he had no right, that after unlocking the door he returned the key to the pocket of his shirt which he later exchanged for a soiled shirt to wear while he was carrying and set-

ting the fuel with which the fire was to be made, and that as a trespasser in the Torti house at 1:45 in the morning he placed a container of kerosene-gasoline on an electric stove which heated faster than he anticipated and an explosion followed. He dived or was blown through a window and then stumbled on foot for two miles while in a horribly burned condition. When finally taken to a hospital, where he died, he related an obviously fabricated story that he had fallen into a pond and was burned when, in drying his clothes, he fell into a fire. There is literally nothing in the case to warrant the conclusion that Flynn was in the Torti house on some legitimate errand or, as suggested by the lower Court, he was a "dupe" or that he had been "abandoned by the perpetrator [Bolish] to his fate."

Eager as police authorities, district attorneys, and even judges are to solve crime mysteries and to visit on criminals the punishment they deserve, neither abstract justice nor specific law will permit guesses and suppositions to take the place of evidence. The lower Court attempted to supply the break in the bridge of causation between Bolish's arson plan and Flynn's death by mounting a span which declared that Flynn was an innocent dupe, but this span crumbles at the slightest touch of analysis and the bridge falls with it. What would Flynn be doing in a strange house in the middle of the night? Why did he fabricate the so palpably untrue tale that he received his fatal burns while drying wet clothes? Flynn was not a third-person victim of a felony (the innocent person contemplated in the Act of 1860), but an active participant in the commission of a felony who came to his death through a fortuitous combination of circumstances not falling within any proposed contemplation of the felony.

In addition to the all-important reason that one not guilty under law of a capital offense should not be

sent to his death, there is the all-vital matter to consider that this Court should not enlarge the scope of the Act of 1860 beyond its obvious purpose and objective. It has taken centuries to remove much of the inhumanity which originally formed part of criminal codes in all parts of the world. We must not revert to the thinking of the age when revenge and blind castigation dictated executive and judicial policy. That punishment deters much crime cannot and will not be disputed. Nor can it be denied that, despite the philosophy of benevolence and forgiveness, there has not yet been found a substitute for punishment for certain crimes. However, punishment, in order to be effective, must be logical and scientific. It cannot be mandated through blunderbuss thinking. A man who commits arson must be punished for arson and not simply because he is a bad person. As Judge ROBINSON well put it in his excellent Dissenting Opinion in the Court below, "Civilized people have long since refrained from executing the wicked merely for the general good of the community." He said further: "Even a knave ought not to be put to death unless he is guilty, by the law of the land of the offense for which the extreme penalty has been provided."

Our criminal code does not impose the penalty of death for the crime of arson. Judges may not, by following a certain line of argument, arrive at the conclusion that arson leads into and becomes murder when a non-criminal death fortuitously coincides with some factor involved in the commission of arson. The constructive murder theme of the Act of 1860 is salubrious, wise and just, but one cannot take it farther than the law originally intended. It cannot be assumed that because a line is headed in a certain direction one can carry it an infinite distance and still stay within the original purpose of the drive. A person travelling south

for a warmer climate will find that if he travels too far he will encounter a more frigid clime than the one he experienced in the place he started from. Even the straightest line eventually curves on the earth's surface.

I believe that some of our decisions have gone too far in application of the constructive murder theme of the Act of 1860. The case of *Commonwealth v. Doris,* 287 Pa. 547, is in point. Five robbers participated in a bank robbery. While they were escaping, a gun battle with the police occurred. Doris was captured. While he was in the custody of the law and at a point removed from the shooting, one of his co-robbers (a certain Curry) shot and killed a policeman. Doris was charged with first degree murder on the theory that the death occurred in the perpetration of a robbery in which he was a participant. He was convicted and executed. That Doris was a criminal and robber is evident, but it is difficult to follow the reasoning which justified his conviction of murder when the death which occurred at the hands of another criminal took place *after* Doris's criminal venture had terminated. Logic which ignores facts ignores justice. One could well assume that Doris was just as bad a person as Curry, and might, had he had the opportunity, also have fired a bullet which could have killed the same or another policeman, but the law does not or should not operate on suppositions and on moral abstractions.

In the interest of systematic law, must there not be a limit beyond which the Law of 1860 cannot go? Suppose a bystander, because of a weak heart, died from excitement while witnessing the commission of a bank robbery, would the robbers in that event all be guilty of first degree murder under the Act of 1860? I would answer that question in the negative, but I am afraid that the argument which supports the constructive

murder theme in the case before us could be employed just as effectively and fatally in the hypothetical case indicated. What the law must avoid above all is absurdity because if law does not appeal to reason, it cannot command respect, and, without respect, courthouses are but brick and mortar, timber and stone.

I dissent from the Majority Opinion which holds that the facts as presented in the lower Court could support a first degree murder conviction against Bolish, but I concur in that part of the Opinion which awards a new trial for the reasons stated.