THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* MIGUEL ÁNGEL PALÓU MÁRQUEZ, Defendant and Appellant.

No. 15320. Submitted June 22, 1953.—Decided May 27, 1958.

352

354

*César Andréu Ribas* and *Santos P. Amadeo* for appellant. *J. B. Fernández Badillo, Attorney General (José Trías Monge, Ex-Attorney General,* on the brief) and *Rafael L. Ydrach Yordán, Assistant Fiscal of the Supreme Court,* for appellee.

MR. JUSTICE SANTANA BECERRA delivered the opinion of the Court.

Miguel Ángel Palóu was convicted in the San Juan Part of the Superior Court of eight offenses of first-degree murder and of two offenses of attempt to kill, committed in perpe-

trating arson by burning a building located at 300 Fortaleza Street of San Juan before dawn on December 15, 1949. The trial was held before a court without a jury. He was sentenced to life imprisonment on each of the eight murder counts and given an indeterminate sentence of one to ten years in the penitentiary, at hard labor, on each count of attempt to kill. We turn to consider and decide the appeal taken to this Court from those judgments.

The appellant assigns six errors. In the first he maintains that the Superior Court committed manifest error in rendering judgments of conviction on the basis of informations which do not contain sufficient elements at law to constitute the crimes charged.

The informations on first-degree murder in their pertinent part read as follows:

". . . The said defendants, Lucas E. Castro Anguita, Miguel Ángel Palóu Márquez, and Miguel Cirilo Batalla y Suere, in the hours of the evening of December 14–15, 1949 and in the city of San Juan, Puerto Rico . . . illegally, wilfully, and criminally, with malice aforethought and deliberation, with a firm and determined intent and purpose to kill, showing that they had an abandoned and malignant heart, the three defendants, acting by virtue of common agreement among themselves, illegally killed [name], a human being, in the perpetration by the said defendants of arson in the first-degree burning the inhabited three-story building, at that time No. 300, formerly No. 51 Allen Street, San Juan, Puerto Rico, owned by Benigno Luiña y Pérez Villamil, then and there occupied by human beings on two of its floors and on the other floor by the Almacenes Palóu of the firm Miguel A. Palóu y Cía., S. en C., the said fire having been conceived and planned by the three defendants among themselves . . . ."

Appellant contends that, according to the informations, he was charged with the commission of first-degree murders and attempts to kill by setting fire to a building; that such deaths were classified as first-degree murder on the basis of the statutory crime of burning a dwelling house, such allegations as intent to kill, premeditation, and deliberation being

therefore superfluous and unnecessary; that the term *arson in the first-degree* employed in the informations does not embrace the *"incendio de morada"* mentioned in § 201 of the Penal Code, because the latter contemplates the traditional offense, of England's common-law malicious burning of another's house rather than the statutory offense of arson; and, lastly, that the informations are also insufficient at law because they failed to allege the intent to destroy the building.

 The malicious burning of a dwelling house (*incendio de morada*), mentioned in the Spanish text of § 201 of the Penal Code,[1] 33 L.P.R.A. § 633, and the arson in the first-degree charged in the informations constitute the crime provided and defined in § 398 *et seq.* of that Code. They are not different offenses. According to § 398,[2] 33 L.P.R.A. § 1561, arson is the wilful and malicious burning of a building of another with intent to destroy it. Sections 399 and 400 which follow, 33 L.P.R.A. § § 1562 and 1563, define *building* as any house, structure, vessel, or other erection capable of affording shelter for human beings, or appurtenant to or connected with an erection so adopted; and *inhabited building*, as any building which has usually been occupied by any person lodging therein at night. Section 405, 33 L.P.R.A. § 1568, provides that maliciously burning in the nighttime an *inhabited building* in which there is at the time some human being, is arson in the first degree.

The English version of these sections and of § 201, and which, we need not repeat, is controlling by reason of its origin and source, uses the common term "arson" in referring

---

[1] Section 201.—All murder which is perpetrated by means of poison, lying in wait, torture, or by any other kind of wilful, deliberate and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary or mayhem, is murder of the first degree, and all other kinds of murders are of the second degree.

[2] Section 398.—Arson is the wilful and malicious burning of a building of another with intent to destroy it.

to the *"incendio de morada"*█ used in the Spanish version of § 201 as well as in establishing and defining *"incendio malicioso"* in § 398 *et seq.* All these sections were jointly adopted by our Legislative Assembly when the Penal Code was adopted on March 1, 1902, having the same origin. Section 201 is the counterpart of § 189 of the California Penal Code of 1872, as revised in 1901, and the others are counterparts of § 447 *et seq.* of that Code, as they stood when we adopted them and continued in force in California until 1929, when they were repealed and a different legislation on arson was enacted there.[3] Aside from the fact that the burning of a dwelling, meaning the habitation or abode of a person, is covered by the offense of arson defined in § 398, since it includes the act of setting fire to an inhabited building, that is, a building occupied at nighttime by a tenant or dweller, there is nothing to indicate that in adopting the Penal Code of 1902 there was any intention to change in § 201 thereof the statutory concept of arson as used in the Penal Code of California for the traditional and narrower concept of that crime at common law, which no longer prevailed in that state in 1902.[4] By alleging in the informations that arson was perpetrated by burning a building inhabited by human beings, defendant was charged for the purposes of § 201 with the burning of a dwelling house.

An information charging murder and attempt to kill, even though it does not state that the fire was set to the building

---

[3] 48 West's Anno. Cal. Codes, § § 447(*a*), 448(*a*), 449(*a*). The history of the statutory offense of arson in California and the effects of that legislation of 1929, is covered in *Ex parte Bramble*, 187 P. 2d 411, 31 Cal. 2d 43, *cert. den.*, 337 U. S. 960.

[4] As defined by Coke and Blackstone, arson in English common law was the wilful and malicious burning of the dwelling house of another, not necessarily with the intent to destroy it. It was always considered as an offense against the security of the habitation and of the person rather than against the property. By legislation enacted in 1850, 1856, and later in its first Penal Code of 1872, California abandoned the classical concept of the

with an *intent to destroy it*, is sufficient at law, according to our holding in *People* v. *Castro*, 75 P.R.R. 630 (1953). Section 201 defines murder in the first degree as the murder which is perpetrated by means of poison, lying in wait, or torture, specified in the statute, as well as any other murder not specified, equally wilful, deliberate, and premeditated; or that committed in the perpetration or attempt to perpetrate any of the offenses specified in said § 201, arson being one of them. The informations charge malice aforethought, deliberation, and a firm and determined intent and purpose to kill, which are ingredients of first-degree murder. *People* v. *Méndez*, 74 P.R.R. 853 (1953), *People* v. *Blanco*, 77 P.R.R. 726 (1954). But even if such allegations had been omitted, the allegation of having killed in perpetrating arson is sufficient to charge murder without it being necessary to state separately the ingredients of the offense of arson, for they are impliedly alleged by following the language of the statute. *People* v. *Matos et al.*, 26 P.R.R. 520 (1918); *cf. People* v. *Acosta*, 11 P.R.R. 240 (1906); *People* v. *Alméstico*, 18 P.R.R. 314 (1912); *People* v. *Rosado*, 17 P.R.R. 417 (1911); *People* v. *Calero et al.*, 18 P.R.R. 44 (1912); *People* v. *Izquierdo*, 25 P.R.R. 353 (1917); *People* v. *Olivencia*, 54 P.R.R. 864 (1939).

In the *Acosta* case we held that in an information for first-degree murder alleging that the death occurred in the perpetration of a burglary, one of the offenses specified in

---

offense at common law, enlarging its scope by statute so as to include cases not involving danger to human life and requiring intent to destroy the property. With the repeal in 1929 of § 447 *et seq.* of the Penal Code of 1872, concerning arson, it may be said that it somehow reverted to the common law by adopting in their place § 447(*a*) *et seq.* which are in force at present. Section 447(*a*), the only section in which the term "arson" is employed, refers exclusively to the habitation or dwelling house of another person and its dependencies, as under the common law, with the difference that it may be one's own dwelling or another's. This notwithstanding, California has held that arson is the burning of structures, other than the dwelling house, described in § 448(*a*). *Ex parte Bramble, supra.* See Bolton, *Arson in California*, 22 So. Cal. L. Rev. 221. We, on the contrary, still keep intact the sections adopted in 1902.

§ 201, it was not necessary to allege that it was wilful, deliberate, and premeditated. We also held in the *Alméstico* case that since the murder was perpetrated by lying in wait, which is an element of murder in the first degree, it was not necessary to show other acts of deliberation and premeditation. Conversely, in the *Izquierdo* case we held that under an information for first-degree murder charging defendant with having killed unlawfully, wilfully, with malice and with the firm and determined intent of killing, it may be proved that the murder was committed in the perpetration of burglary even though this fact was not alleged, without thereby causing such a variance between the information and the evidence as to leave the defendant defenseless. And in the *Matos* case, *supra*, in which it was established that death occurred while perpetrating a robbery, we held that the information charging that death was caused illegally, wilfully, with malice aforethought and the firm and deliberate purpose to kill, was sufficient, it not being necessary to allege the perpetration of the robbery, although it could be proved at the trial. The issue in that case, which is similar to the one raised herein by the appellant, was the sufficiency of the information which failed to allege the elements of robbery as a basis for a charge of murder, merely following the language of the statute. We held that this was not necessary. On the other hand, in an information for first-degree murder based on the perpetration of another felony there may concur, without being necessarily excluded, the mental elements of wilfulness, premeditation, and deliberation, depending on the facts to be proved. Therefore, the informations in this case are neither defective nor insufficient at law nor do they violate appellant's constitutional right, as he alleged, of being informed of the nature and cause of the accusation. Organic Act of 1917, § 2, as amended, 39 Stat. 951, Vol. 1 L.P.R.A. p. 53. See *People* v. *Witt*, 170 Cal. 104, 148 Pac. 928; *Commonwealth* v. *Bruno*, 316 Pa. 394, 175 Atl. 518; *State* v. *Bunk*, 4 N. J. 461, 73 A.2d 249, *cert. denied*, 340 U. S. 839; *Commonwealth* v. *Lowry*,

374 Pa. 594, 98 A. 2d 733, *cert. denied,* 347 U. S. 914; *People* v. *Coefield,* 236 P. 2d 570 (Cal.); *State* v. *Reding,* 13 P. 2d 253 (Idaho); *State* v. *King,* 24 Utah 482, 68 Pac. 418; *Harris* v. *State,* 242 Pac. 411 (Wyo.); *State* v. *Meadows,* 51 S. W. 2d 1033 (Mo.); *Cochrane* v. *State,* 59 P. 2d 658 (Ariz.); *State* v. *Montgomery,* 132 P. 2d 720 (Wash.).

■■ In the second error the appellant attacks the sufficiency of the evidence on which the judgments of conviction were based, charging that the trial court in weighing the evidence was moved by bias, passion, and prejudice. He contends in the third assignment that the evidence, if true, established the commission of the offense of destroying and burning insured property for the purpose of defrauding the insurer, an offense defined and punished in § 478 of the Penal Code, 33 L.P.R.A. § 1901, in which case, he maintains, the deaths are punishable as second-degree murder since this offense is not specifically mentioned in § 201.

At the commencement of the trial and after the district attorney had stated his theory, the parties admitted the following:

". . . that a fire occurred on December 15, 1949, which started in Almacenes Palóu located on the ground floor of the building at 300 Allen Street; that there was no direct communication between the premises occupied by Almacenes Palóu and the second and third stories of that building, but that there was a stairway leading from the ground floor to the other two stories which was not connected with Almacenes Palóu, and that eight persons, named by the prosecution, who lived on the second and third stories, died and two suffered injuries as claimed by the district attorney; that they are the persons mentioned in each of the informations for murder and attempt to kill; that those persons died as a result of extensive and deep burns resulting from the fire."[5]

---

[5] The dead persons named by the prosecution were Antonio Requena, age 83; Francisco Rosa Sánchez, age 54; Berty Santiago, a young girl, age 8, all of whom lived on the third floor of the building; the spouses Rosa Julia Maurent and Jorge Sandín López, age 20 and 28 respectively;

In 1944, the appellant and Lucas E. Castro constituted a special business partnership known as Miguel A. Palóu y Cía., S. en C., with a capital of $12,000 which they contributed in equal parts, to engage in the purchase and sale of textiles, fabrics, and other related goods. Palóu was the managing partner and Castro a silent partner. On December 15, 1949, the business was being operated under the name of Almacenes Palóu on the ground floor of 300 Fortaleza Street, which adjoined the building on the corner of Tanca Street. On September 9, 1949, a $40,000 fire insurance policy on its merchandise was renewed. On October 3, 1949, at Castros's request and with Palóu's consent, a written endorsement of insurable interest was attached to the policy, establishing a preference to Castro.

During several days Miguel Cirilo Batalla, coauthor of the fire, testified in court as to all the facts and details relating to the fire of Almacenes Palóu. His testimony discloses, briefly, the following:

Batalla, a citizen of Cuba, arrived in Puerto Rico on November 3, 1949, from the city of New York where he lived and worked, at Palóu's requests, including an international call in the previous month of October, for the purpose of operating jointly a business with a capital of $10,000 to $12,000, to be contributed by Palóu. From his arrival and until the day of the occurrence, Batalla lived in Palóu's home on the fifth floor of San Cristóbal apartments in San Juan. Palóu promptly informed him that the business he had in mind was out of the question and they made attempts to procure others. A few days later, none being available, Batalla insisted on returning to New York; Palóu then broached the subject of his need to set fire to the business in order to collect the insurance, alleging that sales were down and that its financial condition was difficult; that he had to take a drastic measure by setting fire and thus be able to pay his creditors and keep his credit alive, and that his principal creditor and the person to whom he was most

---

Adela Margarita Maurent Almodóvar, a young girl, age 20; Josefa Almodóvar widow of Maurent, a lady, age 60; and Noemí Franceschi Rivera, another young girl, age 21, who lived on the second floor.

interested in paying was Lucas Castro, who would be paid with preference over any other creditor and who had promised not to withdraw his credit and even to extend it. Palóu and Batalla paid several visits to Castro, where they discussed more than once the question of the fire and the manner of carrying it out.

Having decided to burn the store, approximately 15 days before perpetrating the fire Palóu and Batalla acquired three 5-gallon tin pails, and at a place in Isla Verde filled them with gasoline from the tank of the delivery wagon of the business, sealed them, and brought them to the premises hiding them away. They attempted to set fire on two occasions prior to the dawn of December 15, 1949. The first time they gave up because, while Batalla and Palóu were drinking at a nearby cafe, they heard shots at the corner of Fortaleza and Tanca Streets and a number of policemen gathered near the business. The second time was in the evening of December 13, 1949, between eight and ten o'clock. On this occasion, Palóu and Batalla had already entered the store and were making preparations with the gasoline, but since many persons passed by the windows they thought it was not wise to proceed. They finally decided to go ahead the next day, before dawn on December 14–15. Early in the afternoon of the 14th, Batalla went to the Immigration Office in the Post Office Building in San Juan taking with him some photographs in order to obtain a re-entry permit to the United States, it being his intention to leave for Cuba after the fire. Palóu met him there and helped him out with the Immigration personnel. Upon being informed that the photographs did not meet the requirements, they both went in the delivery wagon of the business, driven by the chauffeur, to the photographic studio near the main square to have other pictures taken. From there they left in the same delivery wagon and went to López Batalla's garage located in Martín Peña and there dismissed the chauffeur. They then went alone to another garage to borrow an automobile and authorized Palóu to pick up the vehicle at Stop 25 at a lot or parking area belonging to that garage. About 4:30 p. m. more or less, Palóu and Batalla went over in the delivery wagon to the residence of Lucas Castro to inform him of their decision to set fire that night. They decided it should be between three and four o'clock in the morning and discussed other details, among them, the lack of light, and Castro handed Palóu a flashlight. They talked about the people who lived in the upper floors and of the possibility that some

complication might arise, but they considered that the construction of the building and its walls and the hard wood which would not burn would not bring any complication. About 6:00 p. m. they took leave of Lucas Castro who wished them "good luck," borrowed the vehicle at Stop 25, a two-door two-tone Oldsmobile, 1942 model, license plate No. 3376, and returned directly to Palóu's residence in San Juan, Palóu driving the delivery wagon and Batalla the borrowed automobile. Palou had borrowed this same vehicle the day before for the purpose of attempting to set the fire in the evening of December 13. They got up about 2:00 a. m., descended the stairway of the building without using the elevator, and drove through San Juan in the Oldsmobile to see whether there were any policemen along Fortaleza Street. They saw some policemen at the corners of Plaza de Colón and drove out as far as a *cafetín* past the Capitol which was open, returning to San Juan by the waterfront. They drove up Tanca Street and stopped the vehicle before coming to the intersection of Fortaleza Street. They walked from there to the business premises around the corner. Palóu opened the store with his key and both went in. Once inside they went for the pails with gasoline, opened them with a screwdriver with the aid of a flashlight which was covered with a piece of cloth so it could not be seen from the outside, and spread about 10 or 11 gallons of gasoline all throughout the premises, the walls, the shelves, and all other places having merchandise, which took them about one-half hour, using pasteboard containers. Thereafter they walked to the main door of the building carrying the empty buckets and the unused gasoline. Batalla stood inside the door waiting for Palóu to bring back the vehicle which they had left on Tanca Street in order to put the buckets inside. Palóu arrived moving slowly, Batalla quickly put the buckets inside the automobile which had its door open while Palóu continued slowly a few meters away. Batalla, who was now standing in front of the door half-opened, with the open padlock in his hand, lighted a match and threw it inside the building, causing a terrible explosion and starting a fire which blasted the doors hurling some rolls of material over to the opposite sidewalk. Batalla also rolled on the ground receiving injuries and burns, but did not lose consciousness. He ran out to board the vehicle where Palóu was waiting and drove down Fortaleza Street toward Santurce. They threw away the rest of the gasoline at some point on the road and at another point, which was described

more or less as the beach of the Condado section, they threw the containers away. From there they proceeded to the lot at Stop 25 in order to return the automobile. Batalla got off shortly before arriving so they would not see his burns and injuries and at that moment he precipitatedly fled, wandering from one town to another until December 18, 1949, when at 11:00 a. m. he was found and arrested near Sabana Grande. When he was arrested he was wearing different clothes which he had bought on the road; he had burns and injuries on the face, hands, and one leg; he had not shaved for several days; and was carrying a bag with several pieces of wearing apparel and medicines. The screwdriver which he had used for opening the containers was seized on his person. In his testimony given in court Batalla testified that, in view of the fact that there was no direct communication between the ground floor where the business was located and the stairway and the upper stories, as well as the construction of the building and its cement walls, they thought that the persons residing therein would not be endangered. He also testified that he had taken charge of setting the fire because, for the purposes of the fire, which was to collect the insurance, Palóu should not have any burns or odor on his clothes nor any other sign which could connect him with arson.

The record contains abundant evidence, including expert evidence, to corroborate the testimony of this accomplice. Although the state's chemical expert did not assert that the fuel used was gasoline, he testified that a volatile fuel must have been used which, having been spread inside the closed premises, formed with the air, in the process of volatilization, an explosive mixture which upon being kindled was capable of undermining the ceilings and destroying the building, the explosion being followed by intensive fire. He concluded that the volatile substance used could have been gasoline which, as already stated, produces dense smoke especially if it comes in contact with fabrics. One of the two persons who escaped testified that he smelled a strong odor of gasoline, and the other testified that the third floor was filled with a very dense and asphyxiating smoke. The fact was established that Palóu's financial condition was not good, that he had been sustaining losses for two or three years, his liabilities at the

time of the fire exceeding his assets, and that the principal creditor of the business was Lucas Castro, a partner, in the sum of $19,413.77. There was evidence, independently of that of the accomplice, which confirmed Batalla's and Palóu's moves in the afternoon of December 14, and the steps taken by Palóu that afternoon and the day before to borrow the Oldsmobile car which Batalla identified as having been used that dawn, and on the attempt made the previous night. Near the doors on the sidewalk across the building a police officer found the open padlock to the entrance of the premises and other objects which were hurled by the explosion. The padlock was also identified by the cashier of the business, who was the person who locked it the previous afternoon.

There is no evidence other than Batalla's testimony of Palóu's participation in the plan or scheme itself, nor of his participation in the act itself of setting the fire. But there was independent, direct, and circumstantial evidence tending to connect him with the commission of the offense, as required by § 253 of the Code of Criminal Procedure, 34 L.P.R.A. § 732.[6] A witness named Enrique Ventura Ortiz testified that as he was walking up Tanca Street, accompanied by Francisco Díaz Rivera, he saw Palóu a few seconds before the explosion, alone, driving a car which he described as a light-colored car having two doors; that Palóu went past them slowly at the corner of Fortaleza and Tanca Streets in the direction of the theater, and the witness noticed that the vehicle stopped in front of the store. The explosion occurred as these persons reached the corner of Tanca and San Francisco Streets, and they turned back to the scene of the fire. Another witness who lived near the business premises got up when he heard screams, and upon learning that the fire was

---

[6] Section 253.—A conviction can not be had on the testimony of an accomplice, unless he is corroborated by other evidence, which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient, if it merely shows the commission of the offense, or the circumstances thereof.

in Almacenes Palóu he ran to Palóu's residence to notify him. Mrs. Palóu talked to him at the door in the presence of the employee in charge of the building who showed him to the apartment. Both testified that during some five minutes while they gave the information, they did not see Palóu or find him. Neither did the employee see him coming down from the apartment, at least for the next ten minutes. The night watchman of the lot at Stop 25, where the previous afternoon Palóu had borrowed the Oldsmobile car, testified that Palóu left the car at that lot about 5:00 a. m., some time after the witness had heard the fire engines going in the direction of San Juan, and that Palóu handed him the keys of the vehicle. The cashier of the business testified that she and Palóu had the keys of the padlock and of another lock of the main door, and that she did not open the premises again after closing the previous afternoon. At the police station where the investigation on the fire was being conducted on the 15th, Palóu said to detective Gueits whom he knew: "What a mess I'm in; help me out." Three days later, Sunday the 18th, when Batalla was arrested, Palóu asked Gueits to put in a word with his fellow workers not to harm him. It was established that Palóu made no claim under the insurance policy for the loss of the merchandise.

Policeman Víctor M. Matos, who was summoned as a witness by the district attorney but was not used by him, took the witness stand for the defense. According to his testimony, he had sought shelter from the rain at the door of Sixto Pacheco's optical business located on Fortaleza Street about 25 yards away from the corner of Tanca Street, and he was the first officer to arrive at the scene of the fire when the explosion occurred. He testified that about 15 or 20 minutes later, the firemen not having yet arrived, Palóu showed up at the place driving the delivery wagon of his business, a brown Pontiac, and asked the witness if he had not called the firemen or the police, whereupon the witness told him to go to police station and notify them. Palóu did not go to the police sta-

tion on San Francisco Street, but instead turned and drove away towards the waterfront. The defense then showed to the witness five photographs of the Oldsmobile, admitted as evidence for the prosecution, which Batalla had identified as the vehicle used for setting the fire, in order to prove that that was not the car in which Palóu had arrived at the scene. The witness then identified in another set of photographs the delivery wagon which he claimed Palóu was driving. However, in the course of his direct examination Matos mentioned a person, one Francisco Robles García, whom he described as a little negro *who was there* and who drew near to help put out the fire. On cross-examination, he said to the district attorney that the little negro boy said to him: "Look, cop, that's the car,"[7] to which the policeman replied that he could not catch up with him on foot. The witness identified that person as the one who was pointing to the Oldsmobile in one of the photographs with which the defense confronted him. Again, upon questioning by the defense, he stated that when he heard "Look, cop, that's the car," he saw the rear part of an automobile but could not tell whether it was that one or another one. Matos admitted that Ventura Ortiz and his fellow worker were at the scene of the fire. Ortiz, as already stated, was the witness who identified Palóu as driving an automobile at the corner of Fortaleza and Tanca Street a few seconds before the explosion. The defense tried to prove with the testimony of Palóu's maid that when the fire occurred Palóu was home in bed; that Batalla was seen by a neighbor shortly after the explosion walking fast as he turned Callejón Gámbaro and Tanca Street, in the direction of the Banco Popular, contrary to the route which Batalla claimed he had

---

[7] The defense objected to this evidence as being hearsay. The court admitted the same as part of the *res gestae*. Considering the other factors and circumstances disclosed by the record as to the place, manner, and time in which these words were uttered, such evidence was admissible. 6 Wigmore, *Evidence*, § 1755, 3d ed.; *cf. American Law Institute, Model Code of Evidence-Rule 512*; *Castro* v. *Hettinger & Co.*, 79 P.R.R. 834, 837 (1957).

followed, and that when the fire occurred the business was not insolvent.

There is no doubt that evidence was introduced which, as believed and weighed by the lower court, is sufficient to connect Palóu with the commission of the offense, independently of the accomplice's testimony and of the fact of the fire itself, to the extent required by § 253 *supra*. Such evidence will be deemed sufficient if it tends to connect the defendant with the crime, and it does not have to be strong or direct, particularly if the accomplice's testimony has been produced. See *People* v. *Portalatín*, 73 P.R.R. 320, 322 (1952); *People* v. *Portalatín*, 72 P.R.R. 145, 154 (1951); *People* v. *Baerga*, 70 P.R.R. 85, 88 (1949); *People* v. *Segarra*, 70 P.R.R. 458, 466 (1949); *People* v. *Rosario*, 68 P.R.R. 526, 530 (1948); *People* v. *Mejías*, 47 P.R.R. 266, 280 (1934); *People* v. *López*, 42 P.R.R. 487, 490 (1931); *People* v. *Marrero*, 41 P.R.R. 938, 953 (1931).

■■ Conscious of the language used by this Court in the first paragraph of its opinion in *Batalla* v. *District Court*, 74 P.R.R. 266 (1953), and in view of the allegation of bias, passion, and prejudice in the weighing of the evidence by the trial judge in appellant's brief in which his attorneys complained that the trial was not impartial because the entire proceeding was permeated with prejudice for which reason they prayed for corrective action and for a new trial "in an environment of real justice and not mere formulism pregnant with bias, prejudice, and partiality on the part of all the officers and the public itself," we repeat here that we have examined with no less scrupulous thoroughness the testimony given at the trial, which lasted several weeks, in order to determine whether such evidence supports the judgments of conviction which shall border the rest of the life of this offender, and whether he had a fair trial within his constitutional rights. The evidence, as believed and weighed by the lower court, and the record do not warrant our intervention in such a delicate and subjective function which rests entirely

with the judge of the lower court,[8] and convinces the trier, beyond a reasonable doubt, and on solid basis as it ought to be, that the appellant, Miguel A. Palóu, planned the fire of his business establishment and carried it out after dawn on December 15, 1949. We also have the certainty that the imputation that the trial court acted with bias, passion, and prejudice in the weighing of the evidence, which constitutes, in our opinion, rather than an imputation of an error of law, of an attitude which is basically at variance with the concept of a fair trial, cf. People v. Jiménez, 78 P.R.R. 7; Cordero v. Rivera, 74 P.R.R. 548, is wholly unfounded. Every page of the lengthy transcript of the proceedings shows a fair and impartial trial and the action of a judge who was free from prejudice and who at all times protected the rights of the defendant.

■ Palóu's participation in the fire having been established as a matter of fact, the offense of arson must be proved under the circumstances of this case, in all its essential elements, to sustain the charges of murder in the first degree. Cf. People v. Ballentine, 39 Cal.2d 193, 246 P.2d 35; People v. Coefield, 37 Cal.2d 865, 236 P.2d 570; People v. Cavanaugh, 44 Cal.2d 252, 282 P.2d 53; cert. den., 350 U. S. 950; People v. Amaya, 40 Cal.2d 70, 251 P.2d 324.

■ The appellant maintains that Batalla's testimony, the only one on this point, merely established the intent to burn the insured merchandise and a violation of § 478 of the Penal Code, 33 L.P.R.A. § 1901, without the intent to destroy the building, and not the commission of arson under § 398, the deaths, therefore, being at the most murder in the second degree.

The motive in this case was no doubt to destroy the goods by fire and to collect the insurance, but that motive formed the intent to destroy the building. To constitute a fire for

---

[8] Cf. People v. Aquino, 79 P.R.R. 17; People v. Garcés, 78 P.R.R. 95; People v. Piñeiro, 77 P.R.R. 502; People v. Comas, 75 P.R.R. 388; People v. Millán, 71 P.R.R. 410; People v. Blanco, 68 P.R.R. 862.

the purposes of the offense of arson, it is not necessary, according to § 402, 33 L.P.R.A. § 1565, that the building be destroyed, it being sufficient that fire be applied so as to take effect upon any part of the substance of the building. *Cf. People* v. *Valentín,* 75 P.R.R. 787; *People* v. *Hays,* 101 Cal. App.2d 305, 225 P.2d 600; *O'Brian* v. *State,* 6 P.2d 421. The intent to destroy contemplated by the statute is the intent to burn. Curtis, *The Law of Arson,* § § 63, 83; *cf. Rogers* v. *State,* 48 P.2d 344.

The calculated means which the appellant used to impregnate with a volatile and highly inflamable substance the entire interior of the ground floor of the building, clearly established an intent to burn it. Being a subjective question, a specific intent is manifested by the means, manner, and circumstances of performing an act. *Cf. People* v. *District Court and Colón, Int.,* 74 P.R.R. 783; *People* v. *Garcés,* 36 P.R.R. 241; *People* v. *Alegría,* 36 P.R.R. 355; *People* v. *Bianchi,* 18 P.R.R. 560; *People* v. *Ross,* 105 Cal. App.2d 235, 233 P.2d 68. See *People* v. *Goldvarg,* 346 Ill. 398, 178 N. E. 892. In the latter case, which is similar to the case at bar, the fire was started by scattering gasoline inside certain premises which had brick walls, causing an explosion which blasted a wall and extended the fire to another part of the building in which there were human beings. It was said that the mixture of the gasoline vapors with the air inside the place formed such a powerful explosive ingredient that no wall could withstand the force of such explosion. It will be recalled that the chemist in this case testified that the explosive mixture formed by the fuel and the air was capable of destroying the building.

Notwithstanding all the malice aforethought which the appellant harbored in his heart and conscience in his untoward purpose, the evidence does not show that he and his accomplices conceived and acted with a specific intent, with the deliberate purpose, of taking the life of those who fell victims of a blinded conscience in pursuit of selfish interests. Despite

all this, it having been established that the appellant perpetrated arson, the death of the persons who inhabited the upper stories of the building resulting, as stipulated, from the very extensive and deep burns caused by the fire, constitutes first-degree murder by force and operation of § 201 of the Penal Code.[9] *State* v. *Fouquette*, 221 P.2d 404; *Whitfield* v. *Commonwealth*, 128 S.W.2d 208; *State* v. *Glover*, 50 S.W.2d 1049, 87 A.L.R. 414; *People* v. *Machado*, 309 P.2d 903; *People* v. *Morlack*, 292 P.2d 897; *People* v. *Osborn*, 231 P.2d 850, 37 Cal.2d 380; *People* v. *Coefield*, 236 P.2d 570; *Southworth* v. *State*, 125 So. 345; *Commonwealth* v. *Lowry*, 98 A.2d 733; *People* v. *Witt*, 148 Pac. 928; *People* v. *Hadly*, 165 Pac. 442; *People* v. *Perry*, 94 P.2d 559; *cf. People* v. *Caballero*, 87 P.2d 364. See *Green* v. *United States*, 218 F.2d 856, in which, under a provision of the District of Columbia similar to § 201, D.C. Code 1951, § § 22–401, it was held that an instruction on second-degree murder was erroneous because the evidence established a death in the perpetration of arson, and that only a conviction of first-degree murder or acquittal would have been proper. A second appeal in this case, 236 F.2d 708, from first-degree murder, was reversed by reason of former jeopardy in 355 U.S. 184, 2 L.Ed.2d 199.

The remaining three errors need not be discussed at length. In the fourth assignment it is alleged that it was prejudicial error to admit in evidence the sworn testimony

---

[9] In the light of the re-examination we made in *People* v. *Méndez*, 74 P.R.R. 853, and *People* v. *Blanco*, 77 P.R.R. 726, of the mental elements of murder, under the facts of this case, the death could be characterized as second-degree murder except for the express provision contained in § 201 making it first-degree murder. The penal concept embodied in this provision, commonly known in Anglo-Saxon law as "felony murder," has been and is strongly attacked, particularly in England, and has been branded as rude and medieval and as being an anachronous residue of the era in which acts were punished without regard to the delinquent's intent. The criticism is based mainly on the fact that this penal concept, originally adopted in Pennsylvania in 1794 when murder was first classified into degrees, ignores and at the same time subverts the basic principle of culpability based on the mental condition under which a crime is committed (*mens rea*) and the principle of punishment in proportion to the culpability. The assumption seems to be that first-degree murder requires

which Palóu gave before the district attorney on December 15, 1949, without any legal warning, and that the error was not cured when it was subsequently eliminated from the record. Palóu appeared before the district attorney at the preliminary investigation of the fire, not as a defendant, but as a witness. It was so held by the Superior Court in its final judgment of December 16, 1949, in the habeas corpus proceeding (No. 243) instituted by him. The district attorney informed him that the fire of his store was being investigated, and asked him if he was in a position to help him clarify the facts, to which Palóu answered that he was. Since the statement was eliminated from the record before the case, which was tried by a court without a jury, was submitted, we need not discuss the alleged error concerning its admission. All we need to say is that that statement is not a confession; it is not incriminating and does not contain any element of proof without which the judge could not have reached the same conclusion of culpability which he reached in the light of the entire evidence, so that the fact alone that he learned of its content, even though the statement was from the very beginning inadmissible, was not prejudicial to the appellant.

 The fifth error deals with the admission in evidence of a key. Police lieutenant Alejandro Oliveras, who was on duty at San Juan headquarters, testified that during the fire

---

a more specific mental condition than malice aforethought, because the wilfulness, premeditation, and deliberation which characterize it constitute a most particular combination which evidences a specific purpose to kill a human being. The tendency to enlarge the concept of murder is a source of concern made manifest in such decisions as *Commonwealth* v. *Almeida*, 362 Pa. 596, 68 A.2d 595 (1948); *Commonwealth* v. *Bolish*, 381 Pa. 500, 113 A.2d 464 (1955); *Commonwealth* v. *Thomas*, 382 Pa. 639, 117 A.2d 204 (1955). It is not our intention to state at this time, much less to discuss, such a complex problem, nor is it our mission in this case to reform the law, but to apply the law as given to us. We bring up the point without any thought of expressing an opinion or judgment, because we are precisely in the process of adopting new penal legislation. As an initial insight into the problem, see: *Felony Murder as First Degree Offense: An Anachronism Retained*, 66 Yale L. J. 427; Arent, *Felony Murder Doctrine*, 20 Cornell L. Q. 288; *Recent Extensions of Felony Murder Rule*, 31 Ind. L. J. 534, and the authorities and bibliography cited.

he picked up from the sidewalk across the building an open padlock which he locked in order to put it into his pocket. A padlock, already identified by Batalla and later by the cashier of the business as the padlock of the main entrance to the store, was exhibited to Oliveras who admitted that it was the same one. He next testified that while Palóu was at police headquarters on December 15, lieutenant Soto asked him if he had the key to that padlock, to which Palóu answered that he had it and took it out from a keyholder, and there they opened the padlock. Something similar happened with the employee of the business who during the investigation delivered to the district attorney the key to the padlock which she had in her possession and was admitted in evidence in the course of her testimony in court. When the key was offered in evidence in connection with Oliveras' testimony, the defense objected alleging that Palóu had been forced, without warning that it could be used against him, to perform an act contrary to his will thereby incriminating himself. Appellant's contention is wholly without basis. From Oliveras' testimony there is no showing or inference of duress or involuntariness, nor did appellant produce any evidence of rebuttal to show that the facts did not occur as related by the witness. On the other hand, the presumption was that Palóu had the keys to his establishment to which he had access. We need not, therefore, discuss the question of alleged self-incrimination either as a problem of admissibility of evidence, in the light of the constitutional guarantee against self-incrimination, or as a problem of immunity in the light of Act No. 13 of April 9, 1941 (Sess. Laws, p. 346), discussed in appellant's brief. *Cf. Batalla v. District Court, supra.*

The sixth error charges that the trial court erred in allowing Palóu to waive a trial by jury through his counsel, without the judge having obtained an intelligent waiver after appropriate interrogatory. This assignment is not supported by our decisions, particularly since in this case a trial

by jury was a privilege which had not as yet been converted into a constitutional right. *People* v. *Hernández*, 55 P.R.R. 921; *Ramos* v. *Rivera*, 68 P.R.R. 509; *People* v. *Berenguer*, 59 P.R.R. 79; *People* v. *Plata*, 43 P.R.R. 443; *People* v. *Figueroa*, 77 P.R.R. 175; *People* v. *Tosado*, 77 P.R.R. 409; *People* v. *Santiago*, 78 P.R.R. 64.

▇▇▇▇▇▇ Lastly, we turn to consider the convictions of attempt to kill. The informations for this offense, which are similar to those for murder, recite that the defendants, with malice aforethought and deliberation, with a firm and determined intent and purpose to kill . . . "*attempted to kill* [name], *a human being, which they were unable to carry out, in the perpetration* . . . *of First-degree Arson in the inhabited* . . . *building* . . . ."

Sections 217 to 221 of the Penal Code, 33 L.P.R.A. § § 731–35,[10] under the caption "*Atentados contra la Vida*" in the Spanish version, and of "Attempts to Kill" in the original English version, list a series of specific acts considered as such attempts or intent to kill, among which the perpetration of arson is not included.

Arson may be the means employed by a person who has the purpose of killing another, but such is not the case here. There is no statutory provision for attempt to kill or attempt to commit murder in connection with a human being who suffers injuries or whose life is endangered by the perpetration of arson as we find in § 201, which provides that death as a result of such perpetration is murder in the first degree even though, according to the jurisprudence and authorities cited, such death be accidental or unintentional. The informations for attempt to kill must therefore be based either on

---

[10] These sections include the administration to another person with intent to kill, of a poison or other noxious substance but by which death is not caused (§ 217); assault on another person with intent to commit murder (§ 218); and the acts relating to railways and bridges described in § 219. Our Code also included the acts mentioned in § § 220 and 221, although in California they appeared (§ § 346 and 347) under the caption "Other Injuries to Persons" and not as attempts to kill.

the express provision of § 218, 33 L.P.R.A. § 732—the assault on another person with the intent to commit murder, assuming in this case that the assault could have been the act of setting the fire—or on the provision of § 50, 33 L.P.R.A. 96, which punishes the attempt to commit any crime, in the instant case, an attempt to commit murder. Although there is some difference, not always easily distinguishable, between those two closely related modalities of the frustrated murder, it is an axiomatic principle of law that both require the specific intent to kill, to take life as the ultimate purpose, already conceived at the time of perpetrating the act, either under the language of § 218 or because any criminal attempt requires the specific intent to commit that crime of which defendant is accused to attempt, and no other. In both modalities there is an *intent* to commit murder, which is *to cause unlawful death*, to kill, with premeditated malice. In an attempt to kill such specific intent must be proved, as a question of fact, beyond a reasonable doubt. As a subjective condition, it may be inferred from the facts and other circumstances proved, but such intent cannot be inferred under the doctrine that every person intends the acts which he wilfully and knowingly performs, or that he intends the natural and logical consequences of his own acts. See *People v. Gómez*, 14 P.R.R. 124 (1908) ; *People v. District Court and Colón, Int.*, 74 P.R.R. 783, 800 (1953) ; *People v. Lyles*, 319 P.2d 745 (Cal.) ; *People v. Bowlby*, 287 P.2d 547 (Cal.) ; *State v. Westbrook*, 285 P.2d 161 (Ariz.) ; *People v. Gallardo*, 257 P.2d 29 (Cal.) ; *People v. Shields*, 127 N.E.2d 440 (Ill.) ; *People v. Van Buskirk*, 249 P.2d 49 (Cal.) ; *People v. Grant*, 233 P.2d 660 (Cal.) ; *Keith v. State*, 235 S.W.2d 539 (Ark.) ; *Beall v. State*, 101 A.2d 233 (Md.) ; *Bowen v. State*, 26 So.2d 205 (Ala.) ; *Wesley v. State*, 198 S.W.2d 103 (Tex.) ; *People v. Carter*, 102 N.E.2d 312 (Ill.) ; *Shanks v. State*, 57 S.E.2d 357 (Ga.) ; *White v. The State*, 13 Tex. 259; *People v. Surles*, 52 S.E.2d 880 (N. C.) ; *People v. Snyder*, 104 P.2d 639 (Cal.) ; *People v. Mize*, 22 Pac. 80; *State v. Mazzadra*, 109

A.2d 873 (Conn.); *People* v. *Miller*, 42 P.2d 308 (Cal.); 98 A.L.R. 918; 1 Wharton, *Criminal Law*, §§ 215, 841, 12th ed.

The state's evidence failed to establish, much less beyond a reasonable doubt, that at the time of setting the fire the appellant had the specific intent to kill as a design or ultimate purpose. The evidence likewise discloses that the plan to set the fire was conceived on the assumption, unfortunately erroneous, that the persons living on the upper stories of the building would not be endangered because of its construction and the lack of direct communication between the premises set afire and the other dependencies. This would not bar a conviction of first-degree murder under the provisions of § 201, or of second-degree murder in the absence of such a provision, for the deaths caused, since the latter may be committed without evidence of a specific deliberate intent to kill. *Cf. People* v. *Méndez*, and *People* v. *Blanco*, *supra;* 1 Burdick, *The Law of Crime*, § 139. The absence of such specific intent actually precludes a conviction of attempt to kill.

The eight judgments of first-degree murder will be affirmed. The two judgments of attempt to kill are reversed.