Commonwealth *v.* Maloney, Appellant.

Argued April 11, 1950.  Before Drew, C. J., Stern, Stearne, Jones and Bell, JJ.

*Thomas D. McBride,* with him *Michael von Moschzisker, Raymond E. Zickel* and *Edward H. Bryant, Jr.,* for appellant.

*C. William Kraft, Jr.,* District Attorney, with him *R. Paul Lessy,* Assistant District Attorney, for appellee.

OPINION BY MR. JUSTICE HORACE STERN, May 22, 1950:

In this appeal from the conviction by a jury of first degree murder with the death penalty the defendant, Walter Maloney, Jr., complains of errors in the trial judge's charge and alleged misconduct on the part of the District Attorney.

In 1930 Maloney was convicted in Philadelphia of murder in the first degree with the penalty fixed at life imprisonment; he was confined in the Eastern State Penitentiary and there met one Alexander Niemi, a fellow prisoner. Maloney's life sentence was commuted by the Pardon Board and he was released in 1946. He subsequently resumed his acquaintance with Niemi and associated with him on several occasions. On the night of January 6, 1949 he met Niemi in Upper Darby, Delaware County. They went in Niemi's car to a taproom in East Lansdowne, then rode around the county for nearly two hours, and about 10:30 P.M., after parking the car on a back street, they entered the so-called "520 Grille" in Chester, where they stood at the bar drinking until around midnight. After the other patrons of the establishment had left and only the manager, Jacob Davis, and a bartender remained in the room Niemi suddenly, with a pointed revolver in hand, said: "Fellows, this is it"; at that moment Maloney backed directly behind Niemi with his hand on a loaded revolver in his right overcoat pocket. Niemi ordered Davis to hand over the paper money from one of the cash registers; Davis obeyed and placed the paper currency on

the bar, whereupon, according to the testimony of the bartender, Maloney scooped it up with his left hand and stuffed it into his pocket. Then Niemi ordered Davis to hand over the paper money from the other cash register; Davis did this and Niemi stuffed it in his own pocket. Niemi then inquired about the drawer underneath this register; Davis opened it and as he did so Maloney started to run; as he reached the storm door and was going through it Niemi, after jerking his head around to observe Maloney, suddenly fired his gun and shot and killed Davis. Niemi then backed out on a run following Maloney and the two of them entered Niemi's car and drove up to Philadelphia; on the way Maloney threw his gun out of the window of the car. He stayed at his home in Philadelphia for about a week, and then, having heard that Niemi had been arrested and that he himself was being sought, he fled to Atlantic City where he remained for over a month; running out of funds he returned to Philadelphia to get more money; here he was arrested and on the following day he gave a signed statement to the Delaware County District Attorney. His trial and conviction followed.

The Commonwealth tried the case on the theory that Maloney had conspired with Niemi to rob the 520 Grille and that they were engaged in a joint venture for that purpose. Maloney's defense, on the other hand, was that he had met Niemi that night only by accident, that he had been on his way to visit his sister in order to return the gun which he had in his pocket to his brother-in-law who owned it; he said that the gun was wrapped in paper. He claimed that he did not know that Niemi had any intention of committing the robbery or that Niemi had a loaded gun in his possession,—that he himself had no thought of doing anything wrong. He had repeatedly suggested to Niemi to "drink up and let's get out of here", the last time being about ten minutes before the holdup. He denied that he had taken any of

the money, stating that what he had picked up from the bar was a newspaper which he had previously purchased. He admitted that he did not carry out his alleged intention of delivering the gun at his sister's house and he also admitted getting rid of it by throwing it away on the return trip to Philadelphia.

During the cross-examination of Maloney the District Attorney called his attention to the fact that in his signed statement, consisting of a series of questions and answers, he had not said anything about the gun in his pocket being wrapped in paper. Maloney replied that he had not been asked about that. Thereupon the following colloquy ensued: "Q. Didn't you say when you had the gun in the pocket, gesture like that, that you had the gun that way? A. No, I never told you. Q. You say you didn't do that? A. Yes, and you know I didn't. Q. All right, we will show what we know. A. Those two men were there. Q. I am going to put them on the stand. A. They never heard me say that and you know it. Q. Look, you just maintain your respect. A. I am maintaining my respect, but you are not going to browbeat me. Q. I am not trying to browbeat you, but I want you to tell the truth and I don't want you to lie." Thereupon counsel for defendant objected and asked for the withdrawal of a juror. The court refused the motion; the District Attorney withdrew his last remark and the court struck it from the record and told the jury not to pay any attention to it. The District Attorney did not characterize any of defendant's answers as a lie, which might well have been reversible error as amounting to unsworn testimony on the part of the District Attorney (*Commonwealth v. Swartz*, 37 Pa. Superior Ct. 507); what he did was to admonish defendant to tell the truth; defendant's own counsel had warned defendant to testify frankly and had reminded him that he was under oath. The effect of such a remark as that here objected to depends largely upon the atmosphere

of the trial, and the proper action to take in such case is largely for the discretion of the trial judge: *Commonwealth v. Del Giorno*, 303 Pa. 509, 519, 154 A. 786, 789. Moreover the Commonwealth in rebuttal called the two men who were present with the District Attorney when defendant's statement was originally made, and they both testified, as the District Attorney had intimated they would, that defendant *had* said that the revolver was in his right hand coat pocket and that his hand was on it; they also testified that, to illustrate the position of the gun, he had "gestured" by moving his hand in a certain manner in his pocket.

In the District Attorney's concluding address to the jury he stated: "They did not call Niemi to the stand." Counsel for defendant objected, stating that he would have had no right to call Niemi. The District Attorney rejoined that he did have a right to call him the same as he had a right to call anybody. The court approved what the District Attorney said and overruled the objection, adding, however: "That does not say anything that Mr. Niemi would or would not say." It is true that Niemi was just as available to the Commonwealth as a witness as he was to defendant; it is also true that he had been convicted at a separate trial and his motion for a new trial was then pending and undetermined so that he might have been unwilling to answer questions on the ground of incrimination. Be that as it may, however, the District Attorney did not argue, nor did the trial judge instruct the jury, that any unfavorable inference was to be drawn against defendant by reason of his failure to call Niemi. This distinguishes the case from *Moyer v. United States*, 78 F. 2d 624, where the jury were told by the court that they had the right to assume that the witness would have testified against the party who should have called him. The mere statement of the District Attorney that "They did not call

Niemi to the stand," without more, did not constitute prejudicial error; it merely recited an obvious fact without following it up by attributing to it any legal significance.

After summarizing to the jury the testimony of defendant the trial judge said in his charge that if it were true that Maloney was absolutely innocent of any evil design, did not know that Niemi had a gun, and had entered the Grille only for the purpose of drinking at the bar, he was a most unfortunate victim of circumstances. Undoubtedly that statement was well justified. Defendant, however, objects to the somewhat rhetorical manner in which the trial judge labored the thought, for he went on to say that, if the affair occurred as the defendant said it did, he was "the most unfortunate human being in the United States of America today" and would be "suffering the greatest injustice that any human being could suffer to be brought before this court and jury for trial", and that, if he was telling the truth, he was "not only the most unfortunate man in the United States of America" but "the most unfortunate human being I could almost say in the universe or that ever was born." While the language thus employed was certainly extravagant the question of its impropriety depends largely on the manner in which it was uttered; the District Attorney denies that it was said in a spirit of ridicule or in a sneering or contemptuous manner such as was condemned in *Commonwealth v. Trunk,* 311 Pa. 555, 566, 567, 167 A. 333, 337, and asserts that it was merely designed to call attention to the vital issue involved, namely, whether Maloney had gone with Niemi in a concerted plan to commit the holdup or whether he was innocent of the whole transaction, did not know that Niemi had any intention of committing robbery, and was therefore the sheer victim of circumstances. When the trial judge's charge is considered in its entirety,

as properly it must be instead of on the basis of isolated excerpts, it appears that the jury were repeatedly told that if they believed defendant's testimony they must under their oaths as jurors acquit him and that they themselves were the sole judges of the facts. The charge carefully protected defendant in all his rights; it was not biased or partisan in tone, and it could scarcely have given the jury the impression that the court was attempting by innuendo, as in *Commonwealth v. Karmendi*, 325 Pa. 63, 68, 188 A. 752, 754, 755, to express an opinion as to defendant's guilt, although even if the trial judge *had* given forthright expression to such an opinion it would not have been reversible error if he left to the jury, as here he did, the ultimate responsibility of determining defendant's guilt or innocence.

In the statement made by defendant to the District Attorney he gave an account, in answers to the questions propounded to him, of his former meetings with Niemi, their activities together on the night of the holdup, the prolonged drinking at the bar of the 520 Grille, the manner in which Niemi pulled out a pistol and pointed it with the remark "This is it", the handing over of the money from the two cash registers, the firing of the gun as Davis opened the drawer underneath one of the registers, the disappearance of Davis as he fell to the floor, defendant's exit through the storm door with Niemi following him, their ride to Philadelphia in Niemi's car, and defendant's subsequent flight to Atlantic City; he also told of his having his hand in his pocket which contained his gun at the time Niemi was pointing the pistol at Davis, and how he threw the gun away on the trip from Chester to Philadelphia. The trial judge in his charge to the jury frequently referred to this statement as a "confession"; defendant claims this constituted substantial error because, while the statement set forth the facts as to what happened with

regard to the holdup it did not contain an admission on defendant's part that he was a conscious and willing collaborator with Niemi in the perpetration of the crime. Technically the statement was not a confession; Wigmore on Evidence, 3rd ed., vol. IV, §1050, defines a "Confession" as "one species of Admission, namely, an admission consisting of a direct assertion, by the accused in a criminal case, of the main fact charged against him or of some fact essential to the charge," and in *Ziang Sun Wan v. United States*, 289 F. 908, 913, it was said that "an admission, not of guilt, but tending merely, in connection with other facts, to establish guilt, does not amount to a confession." It is here to be observed, however, that the trial judge several times referred to the signed paper as "a statement" and, again, as "a statement . . . *in which he makes certain admissions, not a complete case*", and he told the jury that "The confession does not say that he participated in a robbery or burglary." He detailed to the jury the facts set forth in the statement so that they could see and understand for themselves the extent to which guilt could be inferred therefrom when considered with all the other testimony in the case; indeed the jury not only heard the statement read to them when it was placed in evidence but they had it before them in the jury-room so that they could exercise their own judgment as to its significance. In *Commonwealth v. Riggs,* 313 Pa. 457, 460, 169 A. 896, 897, the trial judge told the jury that the defendant made a "detailed statement admitting the crime with which he was charged in the indictment;" this Court said that the charge clearly showed that the judge did not mean that defendant admitted that he was guilty of first degree murder, that the jury could only understand the judge's statement to mean that the defendant admitted his participation in the occurrence in the manner described by him-

self and other witnesses, and that, taken with the whole charge, the statement was not prejudicial. In *Commonwealth v. McConaghy*, 151 Pa. Superior Ct. 26, 29, 30, 29 A. 2d 348, 349, the court in its charge referred to a written statement signed by defendant as a "confession"; the trial judge in his opinion conceded that the word was used inaptly because the statement was not strictly a "confession" in the sense of its being an admission of guilt of the offense charged although it did contain admissions as to certain basic facts; it was held that the court's designation of the statement as a confession was not reversible error, the judge having explained to the jury that the statement was not to be considered as an admission of guilt and the jury having had it as part of the evidence and no doubt having read what it contained.

One of the principal complaints of defendant arises from the fact that the trial judge, after charging the jury that murder committed in the perpetration of any robbery or burglary was murder in the first degree, told them that it was therefore necessary to define for them robbery and burglary, which he thereupon proceeded to do, but his definition of burglary was that contained in the Penal Code of June 24, 1939, P. L. 872, section 901: "Whoever, at any time, wilfully and maliciously, enters any building, with intent to commit any felony therein, is guilty of burglary,"—a definition much broader, of course, than that of common-law burglary. It is defendant's contention that this was a violation of the ruling in *Commonwealth v. Exler*, 243 Pa. 155, 89 A. 968. In that case there was an indictment for murder under section 74 of the Penal Code of March 31, 1860, P. L. 382, which provided that murder perpetrated in the course of any rape should be deemed murder in the first degree; section 91 of that Act defined rape as the unlawful carnal knowledge of a woman forcibly and against

her will or of a woman child under the age of ten years with or without her consent. By a subsequent Act of May 19, 1887, P. L. 128, the crime of rape was extended to include the carnal knowledge of any woman child under the age of 16 years with or without her consent. In the *Exler* case a female child of the age of 12½ years died as the result of being raped, but there was no evidence that the carnal knowledge was without her consent. The question was whether the defendant could be convicted of murder of the first degree; it was held that the term rape in the Act of 1860 must be understood as limited to the definition of it in that Act and could not be extended by its subsequent enlargement in the Act of 1887; in other words, the later Act of 1887 could not be given the effect of extending by implication the penal provisions of section 74 of the Act of 1860. The present case is wholly different in that the enlarged definition of "burglary" is contained in section 901 of the Penal Code of 1939, the same Act under section 701 of which the present defendant was indicted. It should be quite obvious that if the common-law definition of arson, robbery, rape or burglary were extended by a statute enacted *previous*, instead of *subsequent*, to one making the perpetration of any such crime murder in the first degree,—or if, as here, in the *same* statute— the reasoning and the principle of the Exler case would not apply. When the Penal Code of 1939 refers to burglary in section 701 it must be understood as meaning the crime of burglary as defined in section 901 of the same Act. The rule is well established that a word or phrase, the meaning of which is clear when used in one section of an act, will be construed to mean the same thing in another section of the same act: *Bonomo Unemployment Compensation Case*, 161 Pa. Superior Ct. 622, 628, 56 A. 2d 288, 291.

Defendant finds fault with the fact that the trial judge in his charge, after giving to the jury the legal

definition of "conspiracy", directed their attention to the question whether there had been a conspiracy by Niemi and Maloney to commit an indictable offense,— referring obviously to the robbery. A reading of this portion of the charge indicates that it is not subject to the interpretation defendant would ascribe to it. What the court evidently intended was to make the jury realize that, unless there had been some confederation between Maloney and Niemi whereby they were acting in concert in staging the holdup, Maloney could not be found guilty of the murder of Davis. The court stated that the defendant was not indicted for conspiracy but that he could not be guilty of the offense of murder unless there was some agreement or understanding between him and Niemi to commit the crime out of which the killing arose. The charge on this subject was favorable, not harmful, to defendant. Criticism is also made of the court's stating that "murder in the second degree has malice aforethought in it which could be said to be implied malice, that there was no intent to kill, that there was no premeditation, no deliberation, but there was depravity of heart, cruelty, a mind regardless of social duty, wickedness of disposition and recklessness of consequences". It is urged that this definition of second degree murder is erroneous in that it implies that to be murder of that degree there must be neither premeditation nor deliberation, whereas the absence of either one of those attributes would reduce the crime from murder of the first to murder of the second degree. The court, however, had already charged that all murder is of the second degree except murder defined as first degree by the statute; moreover the absence of an intent to kill necessarily connotes an absence of premeditation, wilfulness and deliberation: *Commonwealth v. Samuel Jones,* 355 Pa. 522, 525, 526, 50 A. 2d 317, 319.

The only issue at the trial of this case was whether Maloney had deliberately joined with Niemi in a plot

to hold up the Grille, or whether Niemi's act of robbery and subsequent murder came as a complete surprise to Maloney who was nothing more than an innocent bystander of the event. That issue, under the evidence and the court's charge, must have been entirely clear to the jury, and there was no error in the conduct of the trial or the charge of the court sufficient to vitiate their verdict.

The judgment and sentence are affirmed.